WILMER H. S. BOUCHELLE, ALEXANDER D. SHORT, JOHN W. MILBURN and FRED B. MARTENIS,

*vs.*

TRUSTEES OF THE PRESBYTERIAN CONGREGATION AT THE HEAD OF CHRISTIANA IN NEW CASTLE COUNTY, a Religious Corporation of the State of Delaware, JAMES FRAZER, JAMES B. BEERS, JOSEPH C. BROWN and REVEREND HENRY G. WELBON.

*New Castle, June* 30, 1937.

*Caleb S. Layton,* of the firm of Richards, Layton & Finger, for complainants.

*James R. Morford,* of the firm of Marvel, Morford, Ward & Logan, for defendants.

THE CHANCELLOR: The case presents an unfortunate controversy that has arisen among the members of what is known as The Presbyterian Congregation at the Head of Christiana. Head of Christiana is of geographical significance. The place of worship has always been near the Christiana River or, as it was called in former times, Christiana Creek. The congregation is a very old one, dating from about the year 1708. The land on which the house of worship is located was acquired by the corporate defendant, duly incorporated under the laws of this State, in the year 1806. The corporation was created in 1787. The church lot proper, acquired as just stated in 1806, is held by the corporation on a lease for 999 years. The lease contains the following provision:

"Provided always nevertheless that if the Presbyterian professors should decline or cease so far that none of that Denomination of Protestants will be to continue that way of Worship in said House as afsd that then and in such case it shall and may be lawfull to and for the said Allen Steel and James Steel, their heirs and assigns, in and upon the said premises (all but the graveyard which is hereby excepted and foreprized from a reentry) to re-enter and the same to hold possess and enjoy, anything herein contained to the contrary notwithstanding (only it is hereby excepted and foreprized that in case of the death of a Minister or his absence for some term of years till another can be got, it shall not invalidate this lease or give any liberty of Re-entry as above specified.)"

The defendants admit that ever since 1789, down to the present year, the congregation has been affiliated with The Presbyterian Church in the United States of America, an unincorporated body which was formed in that year, and that it has ever since, until the present controversy arose, worshipped in accordance with the doctrines and be-

liefs of The Presbyterian Church in the United States of America and has been governed by the rules and discipline thereof. Throughout the years it has drawn its ministers from the accredited body of Presbyterian clergy of that affiliation, and its property has been used and employed in connection with and in furtherance of divine worship pursuant to the doctrine, government, discipline and rules of the said The Presbyterian Church in the United States of America.

The Presbyterian Church has a government and polity peculiarly its own. It has its own Confession of Faith, Form of Government and Book of Discipline. A precisely defined gradation of authority is found within its constitution. The entire governmental authority is vested in church judicatories, consisting first of the Session which has jurisdiction over affairs pertaining to a single congregation, and then, in order of ascending importance, of the Presbytery having jurisdiction over a district comprising several congregations, a Synod having jurisdiction over a larger area including several Presbyteries and culminating finally in the General Assembly which is the ultimate authority in all matters pertaining to the entire church. The church has a Constitution and Form of Government to which all of its members subscribe and by which all of its component parts, members, Sessions, Presbyteries, Synods and General Assembly are bound.

In 1933 a controversy was originated in the General Assembly by the Reverend J. Graham Machen, a minister in the Presbytery of New Brunswick, Synod of New Jersey. It was brought forward by him in the form of an overture relating to so-called "Modernism in the Presbyterian Board of Foreign Missions." The overture was referred to the Standing Committee on Foreign Missions and reported unfavorably by that committee by a vote of 42 to 2. The General Assembly by an overwhelming vote approved the com-

mittee's report and sustained the orthodoxy of the persons composing the Board of Foreign Missions.

This controversy had its repercussions which disturbed the peace and quiet of the little church that nestled close to the Head of Christiana. Its pastor was the defendant, the Reverend Henry G. Welbon. Mr. Welbon was of the conviction that Mr. Machen was right in the contentions of his overture and that the General Assembly of the Church was wrong. He became militant in support of Mr. Machen's views and equally so in opposition to the declared judgment of the Church's General Assembly. On June 17, 1936, Mr. Welbon addressed a letter to the Presbytery of New Castle, it being the Presbytery having jurisdiction over the Head of Christiana Session, in which, after rather vigorously accusing the General Assembly and the Presbytery of New Castle because of its support thereof, of heresy, he renounced the jurisdiction of The Presbyterian Church of the United States of America. His letter made reference to the formation of a "true Presbyterian Church" in such a way as to warrant the inference that he would associate himself with it and continue in his work of preaching.

Subsequently the Presbytery of New Castle by orderly procedure decreed a dissolution of the pastoral relations between Mr. Welbon and the Church at the Head of Christiana and deposed him from the office of Minister of the Gospel in the Presbyterian connection.

In the meantime meetings of the congregation were held under the leadership of Mr. Welbon. The trustees of the corporation were seven in number. A majority of them, four in number, were loyal to the church. They caused the doors to be locked and a notice to be posted thereon to the effect that it was not to be opened except with permission of the Session. Mr. Welbon, however, who possessed a key opened the church for congregational meetings and has been conducting services therein notwithstanding his deposition

as a minister. His followers elected five additional trustees. He and his group have affiliated themselves with a newly formed Presbyterian Church known as the Presbyterian Church of America.

Pursuant to the authority of the Presbytery of New Castle, a Reverend John Van Ness was assigned to conduct services and preach in the old church. Mr. Welbon and his associates declined, however, to permit Mr. Van Ness to conduct services or to preach therein.

The bill seeks by appropriate injunctive relief to secure to the complainants, and others in like situation with them, the right to have the church property at the Head of Christiana confined, as it has been heretofore, to use for purposes of religious worship according to the faith and doctrine of The Presbyterian Church in the United States of America as taught and preached by its regularly ordained ministers, and subjected to the ecclesiastical government that all churches belonging to that connection are in duty required to recognize.

The defendants make no pretense at denying that their purpose is, as their acts to date already indicate, to secede from the ecclesiastical connection with which Head of Christiana has been associated for 150 years and to devote the church property to religious uses according to the faith and doctrines of a new Presbyterian Church and subject to a new ecclesiastical government. According to the defendants, The Presbyterian Church in the United States of America has strayed from the true faith and become heretical in its practice if not in its doctrines. This the defendants maintain, notwithstanding the highest judicatory in the church in substance declared otherwise in the most formal and solemn manner.

Now whether the defendants are right in their contentions upon this point of doctrinal controversy, it is not the province of this court to determine. Secular courts

everywhere in America recognize that it is not for them but for the ecclesiastical tribunals, when the church organization provides them, to adjudge and determine questions of purely religious doctrine. Touching those matters which are the special field of pious study and reflection by religious scholars and theological dialecticians the secular courts recognize themselves as incompetent to judge. They leave them for decision by spiritual tribunals, where such have been established by the parties to the controversy or by those with whom the parties stand in spiritual privity, if I may use the term, for adjudication. This is so well established as to need no authority to support it. It was recognized in *St. Nicholas Ruthenian Greek Catholic Church, et al., v. Bilanski, et al.,* 19 *Del. Ch.* 49, 162 *A.* 60.

Acordingly, if the decision in this case were to turn on whether The Presbyterian Church in the United States of America had wandered into the fields of heresy, the answer, so far as this court is concerned, would have to be that it has not. The solemn judgment of the General Assembly is conclusive on that point, so far as this court is concerned.

Secular courts, as a general proposition, cannot concern themselves with doctrinal or ecclesiastical disputes. Where, however, property rights are involved and the controversy with respect to them evolves out of spiritual and ecclesiastical conflict, the secular court is often required, in order to determine the right to the property, to take notice of the religious dispute and to adopt one side or the other thereof. But when the necessities of judicial decision thus lead a secular court into that field, it continues to recognize the impropriety of setting itself up as an arbiter of faith and doctrine. Accordingly it defers to the judgment of the properly constituted ecclesiastical authority which functions in that particular area of conflict, and accepts such judgment as conclusive upon the question in dispute. This principle was decided in the leading case of *Watson v. Jones,*

13 *Wall.* 679, 20 *L. Ed.* 666, and has been generally accepted throughout this country as the settled rule.

It follows, then, that the action of the General Assembly in adjudicating adversely to the charge of heresy in the practices inveighed against by Mr. Machen and his follower, Mr. Welbon, and the action of the Presbytery of New Castle in deposing Mr. Welbon and assigning Mr. Van Ness as the pastor in charge of Head of Christiana Church, are all to be accepted by this court as entirely proper and binding upon everyone who is subject to the governance and law of The Presbyterian Church in the United States of America.

But the defendants say, the Head of Christiana is no longer subject to that governance and law. They distinguish between the local church as a spiritual body and the corporate creature which holds the property that the spiritual body has heretofore used for its religious purposes. They insist that the property is owned by a corporation and the corporation is free to make such use of its property as its officers, who are chosen by the members of the congregation and of course reflect their will, may determine. This is tantamount to saying that the congregation is a law unto itself, entirely independent of any outside connection, and is free to devote the church property, through the managing trustees of the corporation, to any form of worship they please. The right which the defendants assert is, in short, the right of secession from the old connection which has been uniformly recognized and in all respects acted upon for at least 150 years, and of union with a new one.

The defendants rely principally on some early New York cases in support of their position. *Robertson v. Bullions,* 11 *N. Y.* 243; *Petty v. Tooker,* 21 *N. Y.* 267; *Gram v. Prussia, etc., Lutheran German Society,* 36 *N. Y.* 161. These cases hold that in a religious corporation created under the *New York Act of* 1813 (*Laws* 1813, *vol.* 2, *p.*

212), the trustees are the officers of a civil corporation, the corporation is a civil corporation having control over the temporal affairs of the congregation, that it does not and cannot hold the property in a trust limited to the support of a particular faith or a particular class of doctrines, and that consequently the trustees and a majority of the congregation have the right to disregard the decisions of the regularly constituted judicatories of the denominational church to which they had for years adhered and to use the property as freely as any organization constituted on the principle of independent self sufficiency was capable of do-·ing. These cases turned principally on the construction of the New York statute then prevailing, a statute since abrogated.

The courts in the cited cases examined the New York statute in considerable detail and reached the conclusion that the religious corporations which it created were, for all secular purposes, the incorporated forms of the congregations or societies which availed themselves of the privileges of the statute. The trustees were likened to the directors of a civil corporation and the members of the society who elected the trustees composed the constituent body, and, I suppose, would be likened to the stockholders of an ordinary civil corporation. Following out this conception, there was held to be no room for the view that the corporation was an entity separate and distinct from the society as a different entity; and, therefore, it could not be said that the corporation was under any duty to manage the property entrusted to its custody as a trust for the benefit of the society. The society, being as to its secular affairs an incorporated creature, was free to do as it pleased with the corporate property. It was a law unto itself so far as its property was concerned, responsible to no one but itself and totally free from any obligation in the nature of a trust to use the property in furtherance and support

of the particular religious denomination or faith which the society as a spiritual organism was formed to promote.

The other view, which the court stated as possible but which it rejected because of the language of the statute, was that the trustees alone were no part thereof, the society was a separate spiritual entity, and that the corporation held the property was in duty bound to administer it in a sort of trust in aid of the spiritual aims and purposes of the society. If this were the correct view to take of the nature of the religious corporations which the New York statute authorized, the court admitted that the corporation probably would be bound to preserve the property for the uses and purposes of the particular religious belief which the society was formed to promote. All this was said with respect to a church having what I may call institutional connections as distinguished from a church organized on the principle of congregational independence.

Now the statute under which the early New York cases were decided, it appears to me, is quite markedly distinguishable from the Delaware statute under which Head of Christiana was organized. The title of the Delaware act is "An Act to Enable Religious Denominations in this State to Appoint Trustees, Who Shall be a Body Corporate, for the Purpose of Taking Care of the Temporalities of Their Respective Congregations." 2 *Del. Laws, c.* 144*b*. The title of the New York statute was "An Act to provide for the Incorporation of Religious Societies." The distinction is manifest, and emphasizes the fact that the corporations created in Delaware consist solely of the trustees separate and apart from the members of the society, while in New York it is the members of the society together with the trustees that constitute the corporation. Furthermore, we find in the Delaware act language in *Section* 2 which requires the trustees, who are the corporation, to hold and manage the property they acquire "to and for the use of

their respective societies or congregations." In *Section* 7 it is provided in express terms that the trustees shall hold the property "in trust nevertheless, and to and for the use of their societies and congregations respectively," and in *Section* 8 "for the use and benefit of the society or congregation to which they shall respectively belong." No such provisions are found in the New York statute.

Language of this sort can point to only one view which is that the corporation is a distinct entity apart from the society and is under a fiduciary relationship to an association of individuals who are banded together in a voluntary society for the culture and propagation of their common religious and spiritual aspirations.

In so far as the early New York cases depend on the early New York statute for their support, they lose all their persuasiveness here where the statute is quite differentiable. The rule established by the early New York cases, as before stated, no longer prevails in that State. The Legislature of New York abolished it. So that now in New York it is no longer permissible for a religious corporation of a church which has been affiliated with and a constituent part of a large denominational church, such as The Presbyterian Church in the United States of America, and as such has acquired property, to resort to secession therefrom, terminate its relationship therewith and thereby avoid the supervision and control of the denominational organization at large. *Trustees of Presbytery of New York v. Westminster Presbyterian Church*, 222 *N. Y.* 305, 118 *N. E.* 800.

Such in substance has also been determined by this court to be the law in Delaware, though no statute similar to that now existing in New York is to be here found. *St. Nicholas Ruthenian Greek Catholic Church v. Bilanski, et al., supra*. The leading case on this subject is *Watson v. Jones*, 13 *Wall*. 679, 20 *L. Ed.* 666, decided by the Supreme Court of the United States in 1871, which sustains the re-

sult announced in this court in the *St. Nicholas Church Case*. While there is some authority to the contrary, yet its weight lies with the view just stated. See an exhaustive note to be found in 21 *L. R. A. (N. S.)* 692, *et seq.*

The instant case is much stronger against the right of seceders to take the church property away from its long established connection, than was *St. Nicholas Ruthenian Greek Catholic Church v. Bilanski, et al., supra*. For here we find that the principal property which the defendants desire to wrest from its old affiliation, the land on which the church structure is erected, was by the terms of the lease by which it was conveyed to the corporation subject to forfeiture to the lessors or their heirs in case any of "the Presbyterian professors (adherents) should decline or cease so far that none of that Denomination of Protestants will be to continue that way of Worship in said House."

This is a most plain and positive declaration that the property was to be used as a place of worship according to the Presbyterian faith as taught and practiced by that denomination. The only Presbyterian faith which could have then been in the minds of the lessors and lessee, was that which was exemplified by and fostered by The Presbyterian Church in the United States of America. It was the great religious institutional representative of that faith then existing; and Head of Christiana became affiliated therewith and ever since, through a century and a half, continued to be so affiliated therewith.

The defendants say, however, that The Presbyterian Church in the United States of America has strayed into the bogs of heresy and no longer is representative of true Presbyterian faith and doctrine. If, so, they contend, the defendants in wresting Head of Christiana from the old ecclesiastical connection, and affiliating it with the recently formed Presbyterian Church of America, which is the exponent, they claim, of the true Presbyterian faith, are hold-

ing the old church faithful to the purposes of its creation. The trouble with this contention is that it requires this secular court to assume that what is true Presbyterian doctrine and faith is not necessarily to be accepted as such from the decisions of the duly constituted judicatories of the church, but may be ascertained from a group of dissenters who insist that their judgment in opposition to the declared opinion of the church is superior thereto. For the reasons heretofore stated that assumption cannot be made.

Decree for the complainants.