TRUSTEES OF PENCADER PRESBYTERIAN CHURCH IN PENCAD-
ER HUNDRED, HENRY G. WELBON, THOMAS A. BROWN,
ALLEN P. BROWN, WILLIAM C. BROOKS, JAMES LESLIE
FORD and GEORGE G. BROWN,

Defendants Below, Appellants,

*vs.*

WILLIAM GIBSON, HARRY J. ROTHROCK and FRANK H. LONG,
acting as the session of the TRUSTEES OF THE PENCADER
PRESBYTERIAN CHURCH IN PENCADER HUNDRED, and
CHARLES L. CANDEE, WILLARD G. PURDY, JOHN H. DAR-
LING and DONALD ·C. MACLEOD, acting as the legal com-
mittee of the Presbytery of New Castle of the Presby-
terian Church in the United States of America, duly
authorized by the said Presbytery, and individually as
members of the Presbyterian Church in the United
States of America,

Complainants Below, Appellees.

*Supreme Court, On Appeal, November 24, 1941.*

LAYTON, C. J., RICHARDS, RODNEY, SPEAKMAN, and TERRY, JJ., sitting.

*Edward W. Cooch,* for appellants.

*Caleb S. Layton,* of Richards, Layton & Finger, for appellees.

LAYTON, Chief Justice, delivering the opinion of the court:

In the court below the complainants, in alleged official capacity, and, individually, as members of the Presbyterian Church in the United States of America, hereafter referred to as the Parent Church, sought injunctive relief against the defendants, and all other persons in association with them, with respect to the use of property, real and personal, belonging to Trustees of Pencader Presbyterian Church in Pencader Hundred, a religious corporation. A demurrer to the bill of complaint was overruled. 24 *Del. Ch.* 270, 10 *A.* 2d 332. After hearing, a final decree issued enjoining perpetually the defendant corporation, the individual defendants as trustees thereof, and all other persons in association with them, from selling, disposing of, or encumbering the real and personal property of the defendant corporation; enjoining the defendants, and all other persons in association with them, from interfering with the complainants and other loyal members of the Parent Church in the use of the property of the defendant corporation for the purpose of worship according to the doctrines, government, discipline •and rules of the Church; and enjoining the individual defendants, and all other persons in association with them, from using or attempting to use the property of the defendant corporation for the purposes of divine worship or for any other purpose. 25 *Del. Ch.,* 317, 20 *A.* 2d 134. From this decree the defendants appealed.

The essential facts and circumstances surrounding this unfortunate church controversy as collected from the bill, answer, testimony and exhibits, are, briefly, as follows: The Pencader Presbyterian Church is an ancient church. It was in existence as early as 1710, was affiliated with the Presbytery of New Castle as early as 1716, and with the Synod of Philadelphia as early as 1718. The church was originally incorporated in 1790 pursuant to *Chapter* 144*b,*

*Volume* 2, *Laws of Delaware,* passed February 3, 1787. *Revised Code* 1829, 459.

In 1721 William Davids and David Evans conveyed to William Williams and others a lot of land in Pencader Hundred, containing one acre and thirty perches, upon which the original church building was erected. In 1742, Margaret Williams and Thomas Williams, widow and son of Roger Williams, deceased, and his executrix and executor, conveyed the same lot of land to David Howells and others. This deed contained this provision:

"And it is further covenanted and agreed between the said parties to these psnts that the sd David Howells * * * their Heirs * * * shall & will grant full and peaceable Liberty to the Presbyterian Congregation belonging to the meeting House that is builded upon the above said Tract of Land to build, repair all manner of Building or Buildings necessary for the upholding the true Worship of God in the said Place according to the Presbyterian Rule, Discipline and Doctrine according to the Rule and directions of the holy scriptures & will be submissive to the Rules & Directions of the Presbytery of New Castle and the Synod of Philadelphia while the sd Presbytery and Synod walk according to the sd Rule and to no other Sect; opinion or Religion * * *"

The record affords no explanation of the two conveyances of the same property. From the Department of History of the Parent Church there was produced a photostatic copy of an ancient paper referring to a deed acknowledged at the May term of court in 1746, by which Margaret Williams, widow and executrix of Roger Williams, deceased, conveyed to Timothy Griffiths and others a tract of land, west of and contiguous to the first tract, and containing two acres and sixty-eight perches. Available church records tend to show that at least seven of the eleven grantees mentioned in the three deeds were elders of the Pencader Presbyterian Congregation. The two lots of land formed one tract, and were held and used by the Pencader Church as church property until 1918, when all of the land, except that on which the church building stands and a strip of land fifteen feet in width surrounding the building, was sold to Pencader Cemetery Association. It appears that there were

successively two church buildings on the first lot of land, the second of which was sold and removed. The present brick structure stands on the second lot of land.

The Parent Church was organized in 1788, and from that time the Pencader Church was in association with it except for a period of years, not precisely shown, but appearing to be from 1833 to 1870. During this period the Pencader Church seems to have been affiliated with a Presbytery known as the Wilmington Presbytery, but it is not shown by the record whether or not this Presbytery was in affiliation with the Parent Church. It is clear that from 1870 until 1936, the Pencader Church was in association with the Parent Church, and was subject to its constitution, discipline and rules.

In 1933, under the leadership of the Reverend J. Gresham Machen, a controversy arose within the Parent Church with respect to so-called modernism in the Presbyterian Board of Foreign Missions. Upon presentation of the dispute to the General Assembly of the Parent Church, Dr. Machen's attack upon the orthodoxy of the members of the board was overwhelmingly rejected. Thereafter, after due proceedings had, Dr. Machen was deposed or suspended; and he subsequently formed a new church, known as the Presbyterian Church of America.

The defendant, the Reverend Henry G. Welbon, at this time, was the stated supply, or minister, for the Pencader Church. He became a follower of Dr. Machen. In 1936, in a letter addressed to the New Castle Presbytery, he formally renounced the jurisdiction of the Parent Church and any of its courts, charging that body with having prohibited the proclamation of the true gospel, and with having demanded unqualified allegiance to its unfaithful and heretical boards and agencies. Upon charges preferred against him before the New Castle Presbytery, Mr. Welbon was deposed, and he was directed to cease to act as the minister for the Pencader Church.

About the same time, the congregation of the Pencader Church, by formal resolutions, condemned the Parent Church, asserting that it was disloyal to its constitution and doctrinal standards. The resolutions repudiated the jurisdiction of the Presbytery of New Castle, and all connection with the Parent Church; and declared that the Pencader Church should continue to function as a Presbyterian Church, the elders and trustees to be responsible to the congregation. All of the members of the congregation subscribed to the resolutions. A minister assigned by the Presbytery to conduct services at the Pencader Church was refused permission. Mr. Welbon testified that the congregation of the Pencader Church was not affiliated with any Presbytery; that he, himself, was affiliated with the Bible Presbyterian Church.

A preliminary question is largely decisive of the controversy. The appellants insist that, as none of the complainants is a member of the Pencader Church, and as the withdrawal of the congregation from the Parent Church was unanimous, there is no schism in the Pencader Church, and, consequently, the complainants are without interest. The basis of this contention is that the Pencader Church is an independent religious democracy. This error, becoming increasingly manifest, pervades the entire structure of the appellants' argument. A particular church congregation may, doubtless, entertain one opinion or belief. To that extent there is no schism; but if the particular church is in association with an ecclesiastical system, and the opinion or belief so entertained materially differs from that accepted by the Church at large, a schism necessarily results. The congregation may secede, but they cannot take with them the church property even if their action is unanimous. *Trustees of Presbytery v. Trustees of Presbyterian Church of Weehawken*, 80 *N. J. L.* 572, 78 *A.* 207. And this is for the reason, as will hereafter be shown, that the church property does not belong to the congregation. In addition to a sup-

posed official capacity not at all necessary to be examined, the complainants below sued individually as members of the Parent Church. Their interest is clear. On demurrer the Chancellor so ruled. The correctness of the ruling is beyond dispute. *Helm v. Zarecor*, 222 *U.S.* 32, 32 *S. Ct.* 10, 56 *L. Ed.* 77; *Barkley v. Hayes*, (*D. C.*) 208 *F.* 319, on appeal, *Duvall v. Synod, etc.*, [*Shepherd, et al., v. Barkley, et al.*] (8 *Cir.*) 222 *F.* 669; *Shepard v. Barkley*, 247 *U.S.* 1, 38 *S. Ct.* 422, 62 *L. Ed.* 939; *Presbytery of Huron v. Gordon*, (*S. D.*) 300 *N.W.* 33, not yet reported [in State Report].

In support of their contention that the Pencader Church is an independent religious organization, the appellants maintain that the Religious Societies Act of 1787 gave exclusive jurisdiction to church congregations formed thereunder over all the property of the congregations; and they invite a rigid examination of the Act. They point out that the title of the Act is "An Act to enable religious denominations in this State to appoint Trustees, who shall be a body corporate, for the purpose of taking care of the temporalities of their respective *congregations*"; that the Act authorizes every religious society or *congregation* of Christians, of whatever sect, order or denomination, to assemble as directed for the purpose of electing trustees who, thereupon, are constituted a body corporate with perpetual succession; that such corporations are authorized to purchase and hold, and to sell and dispose of, real and personal property for the benefit of the societies or *congregations*; that it was declared that real estate *bona fide* granted to any religious society or *congregation*, or to any person in trust for such society or congregation, prior to October 20, 1744, should be for the use of such society or congregation, according to the true intent and meaning of the grant, and for no other use or purpose; that it was declared that all the estate, title, interest, use and possession of the societies or *congregations*, or of any person in trust for them, at the time of the enactment, should become vested in the trustees, in trust for the

use of their societies or *congregations;* and that the benefit of the Act was expressly withheld from religious societies consisting of less than fifteen families "statedly assembling at one place of worship, being supporters of the gospel in said society or *congregation."* It is contended that the word "Society" was invariably used synonymously with "congregation"; and they make the unsupported assertion that in making use of both words, the purpose was to include within the benefits of the Act Societies of Friends. This argument is not impressive. It is true that the words "society" and "congregation" are often used interchangeably; but "society" is also used as a synonym for "church," and "church" for "congregation." The words have a variable significance, broad or narrow as the occasion demands. The words "church" and "congregation" may refer to a particular and local church, or to a denominational religious body. An accepted synonym for "society" is "association," a word of wide significance. Both in the title and in the body of the Act the word "denomination" is used; and, expressly, the benefits of the Act were offered to "every sect, order or denomination." Associations of churches and ecclesiastical systems, as distinguished from particular and local churches, were, at the time of the enactment, no novelty, were well understood, and, perhaps, more closely adhered to then than now. The purpose of the Legislature was to promote and encourage the growth of christianity by enabling religious societies, whether independent or associative, to manage and control those temporal affairs which were recognized as essential to the maintenance and furtherance of religious beliefs. The denominational character of the religious society or congregation was plainly intended to affect the legal nature of the corporation authorized to be formed. This is implicit in the Act from its very nature and substance, having regard for the history of religious faiths and ecclesiastical organizations. If the narrow construction put on the Act by the appellants is the true one, it necessarily fol-

lows that every local society or congregation, having formed a corporation under the Act for the management of its temporal affairs, is free to devote church property, not specifically impressed, to the use of any other church, at least of another church of the same general creed, notwithstanding the affiliation of the local church with a general denominational church, to the utter confusion, or possible destruction of an association of churches. But this is not a new question in this State. In *Bouchelle v. Trustees of Presbyterian Congregation*, 22 *Del. Ch.* 58, 194 *A*. 100, Chancellor Wolcott pointed out the differences between the Act and the statute at one time in force in New York under which it was held, but never with general approval outside of that State, that corporations formed under the statute had no denominational character, and none could be engrafted upon them, and were not bound by any obligation in the nature of a trust to use the property in support of the particular religious denomination or faith which the society was formed to promote. The distinction between the New York statute and our own was, he said, manifest, and emphasizes the fact that the corporations created under our Act consist solely of the trustees separate and apart from the members of the society, and are under a fiduciary relationship to the association of individuals voluntarily banded together for the culture and propagation of their religious and spiritual aspirations. Substantially, it was held that under the Act it is not permissable in this State for a religious corporation of a church which has been affiliated with and a constituent part of a general denominational church, such as the Parent Church, and as such has acquired property, to secede therefrom, detach the church property from its established connection, and avoid the supervision and control of the denominational organization at large. And the same learned Chancellor, in *St. Nicholas, etc., Church v. Bilanski*, 19 *Del. Ch.* 49, 162 *A*. 60, gave expression to that which, upon reflection will be accepted as true, that there need be no ex-

press dedication of a church property to the worship of God according to the doctrine and faith of a given church in order to affix to it the character indicated by the purpose of its creation and continued use. This interpretation of the Act is manifestly correct; and it is clear that, where a local church, in affiliation with and a constituent of a general denominational church, sought security for its temporal af-·fairs by forming a body corporate under the Act, the property acquired by it in general grant was held by the corporate body, not for the opportunistic purposes and desires of the local society or congregation, but in the sense of a trust for the maintenance and furtherance of the faith and creed of the denominational church at large of which the local congregation was but a component. The appellants seek to avoid the force and effect of the *Bouchelle* case by pointing out that the property in dispute had been acquired in trust for the use of the Pencader congregation prior to the enactment of the statute, whereas in the cited case, the church property was acquired after its passage. This may be admitted; but the statute is comprehensive of church property acquired as well before as after its enactment; and the time when the property was acquired cannot affect the scope and purpose of the Act.

Again, the appellants base their contention on what they term the trust provisions of the deed of 1742. Admittedly the present church structure, the subject of this action, does not stand on the land described in this deed, but upon the land conveyed by the later deed of 1746. Whether the later deed contained provisions similar to those appearing in the first deed is not known. But the appellants contend that the land on which the church now stands and the church itself are impressed with the same covenants and trusts for the reasons as stated in counsel's brief, that it was the intention of the grantor that the two lots be united, and, as one lot, to be held for the benefit of the congregation under the same conditions and for the same uses as those declared

in the first deed; that upon the sale of the church building that preceded the present church, it will be assumed, in the absence of contrary evidence, that the proceeds of sale were used in the erection of the present church, and the trust, following the fund, became impressed thereon; and that the trust was impressed on the present church land and building by implication, declaration of the beneficiary, and by adverse possession or estoppel. The Chancellor held that, as the present church stands on that lot of land conveyed by the deed of 1746, as to which there was no evidence that it contained a covenant similar to that appearing in the deed of 1742, he need not consider whether the provision created a trust affecting the rights of the parties or a mere conditional limitation. In substance, the ruling was that the trust, if indeed a trust, was not impressed on the land on which the church now stands. Quite apart from any question of interpretation, the contention of the appellants meets with difficulties. The trust and abuse of it must be clearly established, either directly or by the most necessary inference. It appears that when the deed of 1742 was made, the land was already in the possession of the Pencader Church through the deed of 1721. The deed of 1746 and the record of it are lost. The ancient paper in evidence proves clearly enough the fact of the conveyance of the second lot of land and the description of the lands conveyed, but no more. The Pencader Church, from 1788 to 1833, admittedly was a constituent of the Parent Church, and likewise from 1870 to 1936. Why the Parent Church did not seek to establish its authority and dominion over the church during the period of separation, if there was a separation, is of small consequence. Studied inaction may have been thought politic and wise. At least, abandonment has not been shown. In the circumstances disclosed it was for the appellant to prove that the church property was impressed with a specific trust, not by speculation or dogmatic assertion, but by that which the law recognizes as evidence. The fundamental unsound-

ness of the contention in this particular respect is that it is based on conjecture. At the trial it was attempted to be supported by purely hearsay evidence. Many exceptions were noted to the rejection of evidence by the court, but only one of them seems to be relied on. A history of the Pencader Church written by Dr. William T. Skinner, an Elder of the Church, and published in 1899, was offered in evidence to prove that a former church building was sold and the proceeds applied to the erection of the present church building. The objection was properly sustained as being hearsay evidence. Historical facts of general and public notoriety may be proved by reputation, and that reputation may be established by historical works of known character and accuracy; but when a treatise on history is offered as embodying a reputation of a community upon a fact in issue, primarily it is looked upon as no more than the statement of the writer, unless it is a work so widely known, so long used and so highly respected and generally accepted, that it can be said to be representing the belief of the community. The principle ought not to be applied too narrowly; but the facts upon which the opinion or reputation is based must be such facts as have been of interest to all members of the community as such, and, therefore, have been so likely to have received general and competent discussion, as to have settled them, in public belief, with fair finality. 5 *Wigmore, Evidence,* (*3d Ed.*) § 1598. Limitations of space prevent an extended discussion of the principle. It is sufficient to say that, from whatever offers of proof with respect to historical works as are disclosed by the record, the rulings of the Chancellor were correct.

But, in the bare hope that, in the minds of some, at least, of the congregation the question will be put at rest, we are not unwilling to examine the language of the covenant contained in the deed of 1742 for the purpose of ascertaining whether it contains anything to support the contention that unrestricted management and control of the property was

vested in the congregation of the Pencader Church. The covenant is readily susceptible to division. First, the Presbyterian congregation is granted full liberty of worship at the church then on the land, or at another church built thereon, according to the presbyterial rule, discipline and doctrine, and submissive to the rules and directions of the Presbytery of New Castle and Synod of Philadelphia. Thus far, there is every evidence that the congregation was not invested with the authority to judge of the regularity of Presbyterian creed. On the contrary, the congregation was enjoined to be submissive to the higher judicatories. But the limitation put on this submission was, so long as the Presbytery and Synod "walk according to said rule, and to no other sect, opinion or religion." Immediately the question arises, Who is to judge and determine the standard of faith? Certainly not the congregation for they, primarily, are put in submission to the Presbytery and Synod; and it would be absurd to suppose that, having been placed under the rule and direction of the superior judicatories, the congregation, nevertheless, was authorized to sit in judgment on their regularity of faith. But, quite plainly, the Presbytery and Synod were placed under some control with respect to Presbyterian doctrine and creed, and as that control, very clearly, was not vested in the congregation, it must be looked for elsewhere. There is the possibility, speculative perhaps, that as an ever living place of worship according to the Presbyterian faith was in the mind of the grantor, the establishment at some future time of a supreme judicature, such as was actually established in 1788, was contemplated; and certainly the idea of a supreme council or consistory was not foreign to John Calvin's conception of a proper church government. The alternative is that the grantor reserved the right, for herself and her heirs, to judge of the orthodoxy of the Presbytery and Synod. But whichever may be the correct view, there is nothing in the language of the covenant, reasonably considered, from which it may be in-

ferred that the congregation of the Pencader Church was vested with the authority to determine the regularity of the doctrine and creed to be taught and practiced at that church, or which exalted them to the status of a judicature superior to Presbytery and Synod, and, upon their own determination of heresy, to authorize them to make use of the church property for the advancement of an orthodoxy established by themselves. Such an unusual power and authority must rest in special and unmistakable grant. When the clumsily and doubtfully phrased covenant is considered in its entirety, as it must be, and an attempt is made to reconcile its apparent inconsistencies, all that reasonably can be said of it is, that the grantor meant no more than to declare that the land and building should be held for the maintenance of a place of worship in accordance with the faith exemplified and directed by the rules, discipline and doctrines of the Presbyterian Church at large, and to the exclusion of all other religious opinions and creeds.

The principle is recognized that in a case where the subject of controversy is property which, by deed, will or other instrument, has been in express terms, devoted to the teaching, support and spread of some specific form of religious doctrine or belief, and the doctrine to be taught, or the form of worship to be used, has been definitely and clearly laid down, it will, in a proper case, be the duty of the civil court to attempt the delicate and difficult task of determining whether the one accused of violating the trust is holding or teaching a different doctrine or using a form of worship which is so far variant as to defeat the declared objects of the trust. *Watson v. Jones*, 13 *Wall*. 679, 20 *L. Ed*. 666. And it may well be that the civil courts will interfere in a case where it is shown that the controlling authority of a general church has indisputably abandoned fundamental and characteristic doctrines and beliefs to the diversion of church property from the objects and purposes of the implied trust to which it is subject. *Mack v. Kime*, 129 *Ga*.

1, 58 *S. E.* 184, 24 *L. R. A.* (*N. S.*) 675; 23 *R. C. L.* 449. We are not confronted with either of these situations. At the trial the appellants did attempt to introduce in evidence what is called the "Auburn Affirmation," which, as we understand, was a declaration, subscribed to by some members of the Presbyterian faith that certain doctrinal deliverances of the General Assembly of the Parent Church were but mere theories; but the offer was properly rejected for the reason that there was no evidence that the declaration was even approved by the General Assembly of the Parent Church. But *Watson v. Jones* announces, also, the principle approved by the great weight of judicial authority in this country, that where property, not devoted by its owner to the support of any peculiar form of worship or any special religious dogmas, is held by a religious congregation or ecclesiastical body which is but a subordinate member of some general church organization in which there are superior ecclesiastical tribunals with a general and ultimate power of control, more or less complete, in some supreme judicatory over the whole membership of that general organization, and a question arises which relates to creed, doctrine or teaching, and the property right turns upon a determination of the correctness of religious creed or teaching, the judgment of the supreme ecclesiastical tribunal is conclusive, and the civil court will allow the property to go in that direction in which the decision of the church tribunal carries it. And this for the reason that in this country the civil courts have no ecclesiastical jurisdiction. This principle is to be applied here.

Finally, the appellants assert that refusal of submission to the Presbytery and Synod is justified under the constitution of the Parent Church; and they state the proposition thus:

"That the Defendants have the privilege of withdrawing from the Presbytery, Synod and later formed judicatories of the Presbyterian Church in the United States of America and of refusing submission thereto whenever, in the opinion of the Defendants, such action would be justifiable."

As the proposition is stated, it is uncontestable so far as the individual defendants are concerned. Their right, individually or collectively, to withdraw themselves from the Parent Church is protected to the fullest extent by the Constitution of this State. Individually, or as a congregation, the members of the Church may not be compelled to attend any religious worship, or to contribute to the support of any place of religious worship, or to the maintenance of any ministry, against their free will and consent. But, undoubtedly, the appellants mean far more than is stated in their proposition. First, they say that, under the Presbyterian ecclesiastical system, the government of the local church is in the hands of the Session, which has exclusive authority over the worship of the congregation; that the Presbyterian Church approximates the congregational form of church government, under which the spiritual and temporal affairs of the local churches, the selection of ministers, and ownership of properties are under the exclusive control of the local congregations; that the rights of private judgment in all matters that respect religion are universal and inalienable; that all church power is only ministerial and declarative; and that there is no supreme authority known to Presbyterianism other than the Holy Scriptures and the individual conscience. Some of these averments of fact are abstractly true; some of them are not true; and the conclusion is unwarranted. No one in this country is compelled to ally himself, or to remain identified, with any religious organization; but when he does join a church and becomes a member of that ecclesiastical body, he voluntarily surrenders his individual freedom to that extent; and so long as he desires to enjoy the privileges and benefits supposed to flow from the association, he must conform to the laws by which the religious organization is governed. Apart from the possible case of a clear and uncontestable abandonment of faith and a perversion of the implied trust, he has no right in the nature of a right of property in church assets

which the civil courts can or should protect. Any other view would make impossible the theory of associated ecclesiastical government.

Presbyterianism is one of the principal systems of church polity known as the Christian Protestant Church, occupying an intermediate position between episcopacy and congregationalism. The Parent Church is the largest and most influential of the several ecclesiastical bodies or organizations devoted to the Presbyterian faith. It has a written constitution, consisting of a Confession of Faith, the Larger and Shorter Catechisms, Form of Government, Book of Discipline, and Directory for Worship. The entire governmental authority of the Parent Church is vested in church judicatories. The first and lowest of these is the Session which has jurisdiction over matters pertaining to the congregation. From the Session an appeal lies to the Presbytery which consists of all the ministers, in number not less than five, and one ruling elder from each congregation, within a certain district. A Synod is a convention of the ministers and elders within a larger district, including at least three presbyteries. And the General Assembly is the highest judicatory of the Church, representing in one body all of the particular churches of the denomination. And we find in the Form of Government, the binding force of which these appellants at one time acknowledged, the declaration that, in perfect consistency with the right of private judgment in all matters that respect religion, every Christian church, or union or association of particular churches, is entitled to determine, *inter alia,* the whole system of its internal government; that it is absolutely necessary that the government of the Church be exercised under some certain and definite form; and that it is expedient, and agreeable to Scripture and the practice of primitive Christians, that the Church be governed by congregational, presbyterial and synodical assemblies. A particular church is declared to consist of a number of professing christians, with

their offspring, voluntarily associated together, for divine worship and godly living, agreeably to the Holy Scriptures, and submitting to a certain form of government. At the ordination of ministers and elders the candidate is required to express approval of the government and discipline of the Parent Church. The General Assembly is required to maintain a corporation so as to enable it to receive, hold and transfer property, and to facilitate the management of its temporal affairs; and each synod, presbytery and particular church is required to cause a corporation to be formed and maintained for the same general purposes. It is declared that whenever a particular church is formally dissolved by the presbytery, or has become extinct by reason of the dispersal of its members, the abandonment of its work, or other cause, such property as it may have, both real and personal, shall be held, used and applied for such uses, purposes and trusts as the Presbytery may direct, limit and appoint, in conformity with the constitution; and that a particular church may not mortgage its property in any amount without the written permission of the Presbytery transmitted through the Session of the particular church.

It is true that the Session is charged with maintaining the spiritual government of the congregation, and subject to the Directory for Worship, it has exclusive authority over the worship of the congregation, and of the uses to which church buildings may be put. These powers, however, pertain to religious matters, and cannot be enlarged into an authority in the Session to divorce church property from its connection with the Parent Church. There is nothing in the constitution to support the appellants' theory. The Presbyterian Church in the United States of America is a conception, of which the particular churches are outward and visible signs. Through these churches flow, primarily and largely, the enthusiasm, faith, labor, money and property not only necessary for the maintenance of the particular church and the advancement of the creed in the locality,

but also indispensable to the Church at large, to enable it to function as an ecclesiastical system, to maintain and extend its culture and tenets in this and other countries, and to support and expand its educational and charitable designs. If the appellants' theory is soundly based, the congregation have the right not only personally to secede from the Parent Church, but also in their secession to take with them the church property, a constituent part of the Parent Church. The result would be that the visible evidences of the faith of loyal members and adherents of the Parent Church throughout two centuries, without which the Pencader Church could not have survived, would be wrested from their established association, and devoted to other objects and purposes. The constitution cannot be construed in a manner to include within its terms the means for the destruction of the evangelical organization for the protection of which it was devised. The constitution itself, without more, ought to be a sufficient refutation of the appellants' proposition; but eminent judicial authority is not wanting. In *Barkley v. Hayes, supra* [208 *F.* 322], a decision approved generally and by the highest authority, in speaking of church property not bound by any special trust, it was said,

"It does not belong to the particular congregation which uses it, much less to the individual members of such a congregation. It does not belong to the presbytery or the synod, nor, in a strict sense, to the general assembly. It belongs to the church which is composed of its entire membership; that membership being governed and controlled by the organic law of the church, the administration of which is lodged in certain judicatories rising, in regular succession, to the general assembly or court of last resort, embracing in itself legislative, administrative, and judicial powers."

The authorities submitted by the appellants have been carefully examined. Some of them are clearly not in point; the others are not persuasive.

The decree of the court below is sustained.