THE TRUSTEES OF THE DELAWARE ANNUAL CONFERENCE OF THE UNION AMERICAN METHODIST EPISCOPAL CHURCH, a religious corporation of the State of Delaware, RIGHT REVEREND PHILIP A. BOULDEN, Bishop, REVEREND LUTHER F. SMITH, WESLEY E. TAYLOR, JAMES PRICE and SUSIE OTTERBRIDGE, Members of the Mother Union American Methodist Episcopal Church, sometimes known as the Mother Church, sometimes known as Union American Church of Wilmington, a religious corporation of the State of Delaware, in behalf of themselves and also in behalf of such other members of said church as may desire to join as complainants herein,

vs.

REVEREND DANIEL B. ENNIS, and CHARLES JONES, ERNEST FURROUGH, JOHN STEVENSON, HOWARD DRIVER, WILLIAM THOMPSON, WILSON JOHNS, and LESTER WARREN, Trustees of Mother Union American Methodist Episcopal Church, sometimes known as the Mother Church, sometimes known as Union American Church of Wilmington, a religious corporation of the State of Delaware.

*New Castle, December 16, 1942.*

*Percy Warren Green,* for complainants.

*Louis L. Redding,* for respondents.

PEARSON VICE-CHANCELLOR: Union American Church of Wilmington is a Delaware corporation organized under the statutes relating to religious societies. It owns a church building and a house used for a parsonage in Wilmington. The church is associated with other religious societies of colored people in Delaware and elsewhere, and is known as the Mother Church of the Union American Methodist Episcopal Church. For some time prior to January 1935, respondent Ennis had been the authorized pastor or preacher of the Mother Church, an incident of which office was the right to compensation. The other respondents were trustees of the church corporation. Complainant Boulden, a bishop of the denomination, attempted to remove Ennis as pastor and appoint in his place complainant Smith. The respondents denied Boulden's authority to do what he had attempted, and declined to permit Smith to officiate at the church or to occupy the parsonage. In this suit, complainants sought to depose Ennis and install Smith as pastor. The individual complainants, besides the bishop, are members of the church. No right in the corporate complainant to sue for relief has been demonstrated, and it will consequently be disregarded.

The Mother Church and the other associated churches have adopted a Discipline, consisting of certain religious doctrines, ceremonies, and rules concerning the government and interrelation of the member societies and other affiliated organizations. The Discipline has been revised from time to time. The last two printed editions were published in 1926 and 1934, respectively. The latest edition contains revisions, most of which were made as a result of a General Conference, or a meeting of delegates of the associated churches, held in 1934. Complainants rely upon the 1934 Discipline as the source of the bishop's authority to remove Ennis and appoint Smith as pastor of the Mother Church. The Discipline abounds in ambiguities and contradictions; but enough of it is capable of construction to permit a determination of dispositive questions in this case.

In January 1935, Bishop Boulden appointed a committee of Pastors to hear and investigate charges against Ennis. The latter appeared and challenged the right of the committee to try him. Nevertheless, the committee found him guilty, and so reported to the bishop. Thereupon, the bishop wrote to Ennis, as follows:

"A committee appointed by me to hear complaints and charges against you has found you guilty of Maladministration of law, violation of ordaination vows, sowing discord and conduct unbecoming a christian minister. You are hereby upon receipt of this notice Expelled from Membership, official duties and work in the Delaware and Penna. Conference and the Union A. M. E. Churches thereof. You are hereby ordered to forward to me your ordaination papers which are revoked forthwith."

The Discipline contains rules for the trial of a pastor. The so-called trial of Ennis was not in accordance with these rules, for several reasons. Boulden, a bishop, preferred the charges against Ennis, selected the committee of triers, and made the order of expulsion. A bishop's authority to select triers and to expel members is limited to special cases, where the asserted wrongs are committed during the sessions of a General or Annual Conference. It appears from the proofs that Ennis' supposed transgressions did not occur during a Conference session. In cases of misconduct elsewhere, the Discipline requires that charges against the pastor be referred to a Presiding Elder to bring the accused to trial; that the Presiding Elder "shall form a committee of not less than three Elders" to conduct a trial; that for certain crimes or practices, the accused, if found guilty, shall be suspended until the ensuing Annual Conference, and for other practices, the Presiding Elder shall "demand and receive from him his credentials."

Complainants urge that the finding of the committee of triers should be accepted as binding upon the parties, since Ennis did not attempt to exercise any rights of appeal afforded by the Discipline, and since the decisions of ecclesiastical tribunals concerning matters of church government

are not subject to review by civil courts, citing *Gibson v. Trustees of Pencader P. Church*, 25 *Del. Ch.* 317, 20 *A.* 2d 134, affirmed *post p.* —, 22 *A.* 2d 782, and other authorities. If complainants rely upon the findings of the committee of persons who purported to try Ennis as an adjudication of a competent ecclesiastical tribunal, then manifestly, the burden is on them to establish that the committee was a competent ecclesiastical tribunal. They have not sustained this burden. On the contrary, it appears that Ennis was never tried by the tribunal for which the Discipline, the governing church law, makes provision. It is, therefore, idle to treat the findings of the committee otherwise than as nugatory. Indeed, it would seem that complainants, rather than respondents, are the ones who sought the aid of this court before exhausting proper remedial methods supplied by the church itself.

Complainants contend, however, that wholly apart from the trial, the bishop's removal of Ennis and subsequent appointment of Smith were authorized by portions of the Discipline which set forth "The Official Work and Duties of a Bishop," as follows:

"2. To make Pastoral appointments to the churches over which he presides.

"3. To revoke appointments when in his judgment the appointment has proven a failure and when the revoking of an appointment is for the best interests of the church. * * *

"7. To make the appointment of Presiding Elders * * *."

Of the several independent arguments made by respondents in answer to this contention, but one will be discussed. It is, in substance, a denial of Boulden's authority. Under the Discipline, bishops are chosen by the General Conference and assigned by the Conference to a District or Districts, which are fixed geographical areas in which churches of the denomination are located. A bishop has jurisdiction to make and revoke appointments, and generally to act,

only in the District to which he is assigned. Prior to the General Conference in 1934, Boulden was the bishop assigned to the Third and Fourth Districts. The Mother Church is in the First District. At the time of the Conference, Boulden was the only surviving bishop, the others having died since the preceding General Conference. For many decades previously, it had been the practice to maintain at least three bishops, and if there were less than three at the time of a General Conference, a sufficient number were elected to fill the vacancies. While not requiring any specific number, the Discipline plainly contemplated that there should be more than one bishop at all times. The notes of the Secretary of the 1934 Conference, as well as other evidence adduced, leave no doubt that Boulden exercised a controlling voice at the Conference, was bent upon being the only bishop of the church, and so conducted the Conference as to prevent the election of any other. Boulden was assigned to the Second District. Instead of squarely raising the question whether he should also be assigned to the First District, or whether any other bishop should be elected, he resorted to devious means to accomplish his end without regard to the Discipline. In the early stages of the Conference he appointed a so-called "Judiciary Committee" for the ostensible purpose of advising him. There was no authority or precedent for such a committee under the Discipline or any other rules which have been introduced in evidence. The committee considered the matter of election of other bishops, and then adopted the following resolution:

"We the Judicial Committee having heard each Candidate separately and considering the financial condition of the First Epis. Dist., and the bad feeling among them hereby recommend that the election of Bishops be deferred for at least two years. We recommend that Bishop P. A. Boulden with the Judiciary Committee have full jurisdiction over the first District, and this matter be placed in the Discipline."

Complainants contend that this resolution was thereupon approved and adopted by the General Conference. In fact, it appears to have been presented in a way designed

to conceal Boulden's real purpose and to avoid intelligent consideration of it by the members of the Conference. But conceding that the Conference did approve and adopt it, it would avail complainants nothing.

In the first place, it should be noted that, according to complainants' evidence, episcopal jurisdiction over the First District was not intended to be and was not in fact granted to Boulden alone, but rather to him and the "Judiciary Committee" together. In limiting the powers of the General Conference to enact rules for the church, the Discipline provides:

"The General Conference shall not change any part of the rules of the Constitutional Government of our church. * * *

"* * * The General Conference shall not have power to alter or change any part of our rules so as to do away with the Episcopacy. * * *."

"We hereby affirm the fundamental principles of the Union American M. E. Church which shall forever be regarded as the government or the organization as originally established, which government shall never be changed, viz:

"Spiritual Government:
"Bishop, Elders, Deacons, Preachers, Exhorters, Stewards and Class Leaders."

The Discipline further provides:
"The General Convention is the Constitutional Law making body of the Union American M. E. Church and is subject to call by the people when necessity requires."

It was, thus, plainly beyond the power of the General Conference to make such a drastic change in the organic law of the church as to confer upon a committee any jurisdiction properly exercisable by a bishop alone.

In the second place, even assuming that the Conference was empowered to confer upon Boulden and the committee the requisite jurisdiction over the First District, the attempted removal of Ennis and appointment of Smith was by Boulden acting alone, and not in conjunction with his "Judiciary Committee". Thus, under his own contention,

his acts were unauthorized and improper, for he was never assigned by the Conference as bishop of the First District.

Complainants have failed to establish any right to relief in this court. It is unnecessary to consider numerous other questions raised, for their determination would not change the ultimate result. The bill should be dismissed with costs against the complainants.

A decree accordingly will be advised.