James W. BJORKMAN; St. John's Protestant Episcopal Church of Bellevue and Dayton (aka St. John's Episcopal Church, Inc., of Bellevue–Dayton, Kentucky), a Kentucky Corporation; and the Anglican Catholic Parish of Saint John the Evangelist, Inc., a Kentucky Corporation, Appellants,

v.

The PROTESTANT EPISCOPAL CHURCH IN the UNITED STATES OF AMERICA OF the DIOCESE OF LEXINGTON; Trustees of the Diocese of Lexington, a Kentucky Corporation; and the Right Reverend Addison Hosea, Appellees.

No. 87–SC–904–DG.

Supreme Court of Kentucky.

Oct. 27, 1988.

Reginald L. Thomas, Lexington, for amicus curiae Board of Incorporators of the African Methodist Episcopal Church.

T. Bruce Simpson, Jr., Lexington, for amicus curiae Brown Sebastian, Sarah Cavil, Charlste Clark, Frank R. Cannon, Jr., and Hilrey Milton, Jr.

John S. Palmore, Lexington, for amicus curiae Rector, Wardens & Vestry of Grace Church–Louisville.

Raymond T. Munsell, New York City, for amicus curiae the Domestic and Foreign Missionary Society of the Protestant Episcopal Church in the U.S. of America.

Gerald Kirven, Louisville, for amicus curiae Trustees and Council of the Protestant Episcopal Diocese of Kentucky.

Donald J. Ruberg, Michael J. O'Hara, Covington, for appellant.

C. William Swinford, Jr., Lexington, for appellees.

LAMBERT, Justice.

Upon the secession of St. John's Protestant Episcopal Church of Bellevue and Dayton, a Kentucky Corporation (St. John's), from the hierarchical church organization, the Protestant Episcopal Church in the United States of America and the Diocese of Lexington (PECUSA), a dispute arose as to the ownership of the church property. After hearing the evidence and applying the "neutral-principles of law" doctrine authorized in *Jones v. Wolf,* 443 U.S. 595, 99 S.Ct. 3020, 61 L.Ed.2d 775 (1979), the trial court held that St. John's was the owner of the property. Reversing, the Court of Appeals held that the decision in *Jones* was not obligatory upon state courts; that the compulsory deference rule for resolving disputes between local congregations and church governing bodies remained a constitutionally acceptable method for resolving such disputes, and that it was not at liberty to depart from established Kentucky precedent on this issue. As authority for its decision, the Court of Appeals relied on *Watson v. Jones,* 80 U.S. (13 Wall.) 679, 20 L.Ed. 666 (1871), and this Court's decisions in *Clay v. Crawford,* 298 Ky. 654, 183 S.W.2d 797 (1944), and *Nolynn Ass'n. of*

*Separate Baptists in Christ v. Oak Grove Separate Baptist Church,* Ky., 457 S.W.2d 633 (1970), *cert. denied* 401 U.S. 955, 91 S.Ct. 975, 28 L.Ed.2d 238 (1971). This Court granted discretionary review to consider the issues presented.

In 1978, St. John's withdrew its affiliation with PECUSA. Its withdrawal was unequivocal and there was no dissenting faction. In 1980, St. John's conveyed all of its property to a newly formed corporation, The Anglican Catholic Parish of St. John the Evangelist, Inc. Thereafter, PECUSA commenced litigation and sought imposition of a constructive trust for its use and benefit upon the church property.

It is unnecessary to burden this opinion with a detailed history of the real estate transactions of St. John's Church. It is sufficient to state that the church property was acquired exclusively by the efforts of the local congregation; that through the years title to the property was held by the church trustees and later by a non-profit corporation created by them known as St. John's Protestant Episcopal Church of Bellevue and Dayton, a Kentucky corporation; and that St. John's freely engaged in transactions such as purchase, encumbrance, and sale of its real property without any involvement by PECUSA. Indeed, as a matter of policy, PECUSA exercised no influence or control over St. John's with regard to the church property.

Despite this appearance of absolute ownership of the church property by St. John's, certain facts and documents exist which create a measure of doubt. It is contended that these documents establish the existence of a trust relationship between St. John's and PECUSA rendering St. John's conveyance of the church property to its new non-profit corporation invalid. Prior to discussing the significance of these documents, however, it is appropriate to briefly discuss the law we believe to be applicable to this case.

In *Jones v. Wolf, supra,* the Supreme Court modified the long-standing compulsory deference rule found in *Watson v. Jones, supra.* In place of compulsory def-

erence, the Court held that states may select

> [A]ny one of various approaches for settling church property disputes so long as it involves no consideration of doctrinal matters, whether the ritual and liturgy of worship or the tenets of faith.

*Jones v. Wolf,* 443 U.S. at 602, 99 S.Ct. at 3025. Without mandating use of the neutral-principles of law approach, the Supreme Court delivered a ringing endorsement of it as follows:

> The primary advantages of the neutral-principles approach are that it is completely secular in operation, and yet flexible enough to accommodate all forms of religious organization and polity. The method relies exclusively on objective, well-established concepts of trust and property law familiar to lawyers and judges. It thereby promises to free civil courts completely from entanglement in questions of religious doctrine, polity, and practice. Furthermore, the neutral-principles analysis shares the peculiar genius of private-law systems in general —flexibility in ordering private rights and obligations to reflect the intentions of the parties. Through appropriate reversionary clauses and trust provisions, religious societies can specify what is to happen to church property in the event of a particular contingency, or what religious body will determine the ownership in the event of a schism or doctrinal controversy. In this manner, a religious organization can ensure that a dispute over the ownership of church property will be resolved in accord with the desires of the members.

*Jones v. Wolf,* 443 U.S. at 603, 99 S.Ct. at 3025.

Thus, this nation's highest Court, the final arbiter of federal constitutional law, has held this approach to be constitutional, preferable, and broadly applicable as a method of resolving church property disputes. Even the four dissenting justices who adhered to the view that compulsory deference is preferable acknowledged that "the neutral-principles rule suffices to settle only disputes between the central coun-

cils of a church organization and a unanimous local congregation." *Jones v. Wolf,* 443 U.S. at 614, 99 S.Ct. at 3031.

From the foregoing, this Court is clearly empowered to adopt the neutral-principles approach if we so choose. We are reluctant, of course, to adopt a new rule of law, in the absence of a compelling reason, if such would require us to overrule long-standing precedent. Upon examination of this Court's leading decisions, however, we conclude that the neutral-principles doctrine may be applied to the facts of this case without disturbing our previous decisions.

In *Clay v. Crawford, supra,* controversy erupted between two factions within a hierarchical church organization. A faction within the local congregation refused to accept the appointment of a new minister and seceded from the congregation. The seceding members claimed a right to the church property based on their interpretation of various deeds and trust instruments. This Court recognized an unquestioned church discipline whereby church members agreed to be bound by church law. We said:

> The question is which of the rival factions is the true representative and successor or continuation of that local society as it existed prior to the division. The answer is to be found by ascertaining which of them adheres to or is sanctioned by the governing or central body.

*Clay v. Crawford,* 183 S.W.2d at 800.

Thus, in a factional dispute within a hierarchical church organization, we deferred to the decision of the governing church body and held that the seceding members forfeited their right to the church property.

This Court's decisions in *Bunnell v. Creacy,* Ky., 266 S.W.2d 98 (1954), *Mullins v. Elswick,* Ky., 438 S.W.2d 496 (1969), *Nolynn Ass'n. of Separate Baptists in Christ v. Oak Grove Separate Baptist Church, supra,* and *Pelphrey v. Cochran,* Ky., 454 S.W.2d 675 (1970), all involved congregational forms of church government and either withdrawal of a local church from an association or a factional dispute within local churches. These deci-

**586**

sions have little to do with this case due to the fundamental difference in the form of organization. In each of the prior cases, the congregational nature of the church was the controlling factor. In this case the church organization is hierarchical.

From the foregoing, it appears that this Court may adopt the neutral-principles of law doctrine as applicable in cases of secession by a local church from its hierarchical organization without overruling existing Kentucky law. While the neutral-principles doctrine may not be the panacea foreseen by the majority in *Jones v. Wolf*, in cases such as this, the application of neutral-principles appears to be preferable to compulsory deference since in every case, regardless of the facts, compulsory deference would result in the triumph of the hierarchical organization.

As indicated earlier, PECUSA rests its claim upon the existence of several documents which it contends create a trust relationship with St. John's. The most significant of these documents is an instrument executed in 1907 by the rector, church wardens and vestrymen of St. John's. In paragraph two of the instrument, the Bishop of the Lexington Diocese is requested to

[T]ake the said building under his spiritual jurisdiction ... and thereby separate it from all unhallowed, worldly and common uses, and solemnly dedicate it to the holy purposes above mentioned.

Paragraph three of this instrument states:

And we do moreover hereby relinquish all claim to any right and disposing of the said building, or allowing of the use of it in any way inconsistent with the terms and true meaning of this Instrument of Donation, and with the consecration hereby requested of the Right Reverend, the Bishop of this Diocese.

At the outset, the foregoing applies only to the church building and does not apply to the real estate, the parish hall, the rectory, or any personal property. Moreover, evidence was presented that PECUSA did not regard this instrument as having any legal effect, and the autonomy with which St. John's conducted its affairs through the years bears testimony to this. Further, this instrument may not be construed as a conveyance to PECUSA, and the absence of a reversionary clause renders it unenforceable as an instrument creating an express trust. *Spilman v. Mercer County National Bank*, 268 Ky. 761, 105 S.W.2d 1031 (1937); *Huff v. Thomas' Heirs*, 17 Ky. 158 (1824).

The next instrument upon which PECUSA relies is its own Canon 45 adopted in 1907. Subsequent to St. John's withdrawal, this canon was amended in an effort to strengthen its provisions and recodified as Title II, Canon 7, Section 2 of the *Constitution and Canons for the Government of the Protestant Episcopal Church in the United States of America otherwise known as the Episcopal Church.* Section two of Canon 45 purports to prohibit the encumbrance or alienation of any consecrated church or chapel without the consent of the bishop of the diocese. Uncontroverted evidence was presented that PECUSA regarded this canon as insufficient to prevent alienation in the absence of some provision in civil law rendering it enforceable. Moreover, the official commentary in the annotated constitution for PECUSA indicates that the restrictions on transfer are of moral value *only* and without legal effect. This is verified by the parties' past conduct.

Contrary to PECUSA's asserted position that alienation of church property is prohibited, St. John's articles of incorporation executed and placed of record in 1899 grant total autonomy to the local church in the management of its temporal affairs. The articles recite the routine litany of powers available to corporations and that the corporation may exercise all powers generally available to corporations in this state. The only limitation upon the exercise of its corporate powers is that it refrain from violating the canons of the Diocese of Lexington or the law.

From the documents and testimony presented, we are unable to conclude that an express trust exists in favor of PECUSA.

In its pleadings and at oral argument, PECUSA placed considerable reliance upon the equitable doctrine of constructive trust. The essence of the doctrine of constructive trusts is equitable in nature and devised by courts to prevent a party from benefiting to the detriment of another by wrongful conduct. A constructive trust may be imposed to restore beneficial ownership when legal title has been lost due to illegal, deceptive or unconscionable behavior by the titleholder. *Lowe v. Lowe*, 312 Ky. 640, 229 S.W.2d 442 (1950); *Kaplon v. Chase*, Ky.App., 690 S.W.2d 761 (1985). Our examination of the facts in this case reveal nothing which would justify this remedy. Indeed, the equities preponderate in favor of St. John's.

While PECUSA accuses St. John's of transferring the property to the newly formed corporation, St. John's Anglican, in a fraudulent and conspiratorial manner, thus necessitating the imposition of a constructive trust, we see no evidence of this. Had the evidence established that PECUSA was the true owner of the property, a constructive trust would have been the proper remedy. From the evidence, however, we are unable to reach such a conclusion.

It should be remembered that St. John's acquired the property with no assistance from PECUSA; that the property was managed and maintained exclusively by St. John's; that St. John's improved and added to its property; and that PECUSA deliberately avoided acquisition of title or entanglement with the property to ensure that it would not be subject to civil liability. The record is clear that PECUSA's relationship with St. John's was exclusively ecclesiastical and St. John's was at all times in control of its temporal affairs.

For the foregoing reasons, the decision of the Court of Appeals is reversed and the judgment of the Campbell Circuit Court reinstated.

GANT, STEPHENSON, VANCE and WINTERSHEIMER, JJ., concur.

STEPHENS, C.J., dissents by separate opinion in which LEIBSON, J., joins.

STEPHENS, Chief Justice, dissenting.

Respectfully, I dissent.

I agree with the reasoning of Judge Wilhoit of the Court of Appeals in his concurring opinion. I adopt it as part of my dissenting opinion.

"[T]he decision of the trial court should be reversed. Regardless of whether a 'neutral principles of law' or a 'polity' test is applied to the particular facts of this case, that result should obtain. The articles of incorporation of St. John's Protestant Episcopal Church, which was incorporated in 1899, plainly show a corporate purpose to be affiliated with, and to be subject to the canons of, the Diocese of Lexington by providing that the government and operation of the corporation shall not be 'inconsistent with the Canons of the Diocese of Lexington.' The 1907 'Instrument of Donation' signed by the managing body of the corporation (the vestry) is further compelling evidence of this corporate purpose. There is no evidence of substance to suggest that prior to 1976 the corporation took title by purchase to property with the intent to hold it other than subject to whatever the canons of the diocese might provide from time to time, or that the grantors in the 1899 deed to the new corporation intended that the property be held for any purpose apart from those expressed in the corporate articles."

In the Instrument of Donation, the governing body of St. John's Church imposed conditions constituting a constructive trust in favor of the national church on the use of its church property. In my opinion, this document is dispositive of the issue before us. It is a contract, by which St. John's, as an entity, affiliated itself with PECUSA, and created the constructive trust. Following the gift of the building to the Episcopal Bishop of Lexington, to be under the Bishop's "spiritual jurisdiction," the governing body then stated (in the instrument),

"And *we do moreover hereby relinquish all claim to any right of disposing of the said [church] building,* or allowing

of the use of it in any way inconsistent with the terms and true meaning of this *INSTRUMENT OF DONATION,* and with the consecration hereby requested of the ... Bishop of the diocese." (Emphasis added).

In other words, the local church desired affiliation with PECUSA, through the diocese of Lexington. As part and parcel of that request, the local church not only placed the building under the "spiritual jurisdiction" of the Bishop, but it also *specifically and unequivocally* relinquished authority to control the use of the building. While the instrument understandably focused on the church building itself, it follows from the purpose of the document that the real property on which the church was situated, and affiliated structures and land, were also donated.

By the majority opinion, this Court has totally rewritten and negated the simple, precise intent of this document, i.e., for the donor (St. John's) *to become a member of* PECUSA and to *donate* its church to PECUSA, through the diocese of Lexington. St. John's Church enjoyed the benefits of membership in PECUSA for many long years—its members were confirmed by the Bishop of Lexington, its clergy participated in a PECUSA pension plan, PECUSA insured the church, and the church regularly asked for and received help and advice from the Bishop of Lexington. It was in fact and in law, a member of PECUSA.

I challenge the majority's statement that the equities of this case "preponderate" in favor of the movants. In 1907, when the vestry of St. John's donated the church to the diocese of Lexington, that decision was made by the men and women who built the church and who wanted to affiliate with PECUSA. They considered the benefits of such affiliation and they also understood the obligations of such affiliation. This is clearly shown by the execution of the Instrument of Donation.

For lo these many years the successors to the vestry of 1907 have grown and thrived because of their membership in PECUSA. Because of a disagreement with national church policy, St. John's cannot now repudiate a legal document executed 81 years ago.

I would affirm the Court of Appeals.

LEIBSON, J., joins in this dissent.