EAST LAKE METHODIST EPISCO-PAL CHURCH, INC., a Delaware corporation and a Delaware Religious corporation; John W.H. Bailey, Vernon G. Bailey, Jr., Mae Bailey, Ruth Harris, and Naomi Bailey, Defendants/Third–Party Plaintiffs Below, Appellants,

v.

TRUSTEES OF THE PENINSULA–DELAWARE ANNUAL CONFERENCE OF THE UNITED METHODIST CHURCH, INC., a corporation of the State of Delaware, Plaintiffs Below, Appellees,

and

Thomas J. Eastburn, Esquire, R. Taylor Cloud, Susan Keirn Kester, Mark M. Pruett–Barnett, James T. Seymour and John Holden, Third–Party Defendants Below, Appellees.

No. 158, 1998.

Supreme Court of Delaware.

Submitted: Feb. 2, 1999.
Decided: May 26, 1999.
Rehearing Denied June 30, 1999.

---

51. *Id.* (emphasis supplied) (original in uppercase).

52. *Levitt v. Bouvier,* Del.Supr., 287 A.2d 671, 673 (1972).

Sherry Ruggiero Fallon, Tybout, Redfearn & Pell, Wilmington, Delaware and Walter S. Rowland, Wilmington, Delaware, for appellants.

Thomas J. Eastburn, Allmond and Eastburn, Wilmington, Delaware and Stephen F. Dryden, Robinson and Grayson, P.A., Wilmington, Delaware, for appellees.

Before VEASEY, Chief Justice, WALSH, HARTNETT, and BERGER, Justices and COOCH, Judge.,* constituting the Court en Banc.

WALSH, Justice.

In this appeal from the Court of Chancery, we examine the legal standards that govern disputes over church property between local congregations and general ecclesiastical authorities. The Court of Chancery ruled that the general church authority was entitled to exercise ownership and control over the real and personal property, directing the discontinuance of church services, despite the objection of the local congregation. We conclude that the Court of Chancery correctly applied neutral principles of law in recognizing the

---

* Appointed pursuant to Art. IV, § 12 of the Delaware Constitution and Supreme Court Rules 2 and 4.

claim of the general church authority. Accordingly, we affirm.

## I

This matter commenced in the Court of Chancery with the filing of a complaint by the Trustees of the Peninsula–Delaware Annual Conference of the United Methodist Church, Inc. ("the Conference") against East Lake Methodist Episcopal Church, Inc., a Delaware corporation and a Delaware religious corporation ("East Lake") and certain of its individual trustees (collectively "East Lake"). The Conference sought injunctive relief to secure possession and control of the church property, including a church building, a parsonage, and certain personalty located on the premises, situated at 30th and Tatnall Streets in the City of Wilmington, the site for many years of the East Lake United Methodist Church. The basis for the Conference complaint was a resolution adopted on June 11, 1995 at the 211th Session of the Conference authorizing the discontinuation of further religious services at East Lake and the transfer of control of the property to the Conference. The resolution was purportedly adopted pursuant to ¶ 2549 of The 1992 Book of Discipline of the United Methodist Church[1] and was to be effective July 1, 1995.

The individual defendants, acting as an apparent majority of the trustees of East Lake, resisted transfer of church property to the Conference and filed a counterclaim and third party complaint against East Lake's former pastor, counsel for the Conference and other Conference officials alleging trespass and wrongful interference with, and removal of, church property. The Court of Chancery permitted limited use of the church property, including the conducting of religious services, on an interim basis pending a final determination of entitlement. Ultimately, after extensive discovery and briefing on cross-motions for summary judgment, the Court of Chancery concluded that equitable title to the disputed church property lay with the Conference and permanently enjoined the defendant trustees from interference with the Conference's plan to dispose of the church property. The court also summarily dismissed East Lake's counterclaims and third party complaint. This appeal followed.

## II

The East Lake United Methodist Church is more than 100 years old, and one must look to its history to determine its present legal status. That history be-

1. ¶ 2549 provides in pertinent part:

***

2. *Discontinuation.* a) When, in the judgment of the district superintendent in consultation with the appropriate agency assigned the responsibility of the conference parish and community development strategy, a local church should be discontinued, the district superintendent may recommend its discontinuation. Such a recommendation shall include recommendations as to where the membership (¶ 231) and the title to the property of the local church shall be transferred. On such recommendation that a local church no longer serves the purpose for which it was organized and incorporated (¶¶ 201–204), with the consent of the presiding bishop and of a majority of the district superintendents and the district Board of Church Location and Building of the district in which the action is contemplated, the An-

nual Conference may declare any local church within its bounds discontinued.

b) If a church has been discontinued by the Annual Conference without direction concerning the disposition of property, the property shall be disposed of as if it were abandoned local church property (¶ 2549.3).

3. *Abandonment.* When a local church property is no longer used, kept, or maintained by its membership as a place of divine worship, the property shall be considered abandoned, and when a local church no longer serves the purpose for which it was organized and incorporated (¶¶ 201–204), with the consent of the presiding bishop, a majority of the district superintendents, and of the district Board of Church Location and Building, the Annual Conference trustees may assume control of the property.

***

gins in 1892 when, as recited in an untitled document filed in the New Castle County Recorder of Deeds, certain individuals were elected trustees on January 10 of that year, for the purpose of forming a church to be known as East Lake M.E. Church, located at 30th and Tatnall Streets in Wilmington. Also in 1892, East Lake acquired two parcels of land. The first recorded deed, dated March 19, 1892, recites the grantee as "East Lake M.E. Church" and describes the property on which the current church structure is located. The second deed, dated November 9, 1892 from George W. Booker and Annie E. Booker, his wife, reflects the conveyance of a 25 feet by 100 feet parcel adjoining the first parcel. The grantee in this deed is "East Lake Methodist Episcopal Church."

In 1905, East Lake found it necessary to revisit its 1892 incorporation efforts, and subsequently filed two incorporation certificates with the Recorder of Deeds. One, dated December 5, 1905, is titled "A Certificate of Incorporation of East Lake Methodist Episcopal Church" and is an attempt at incorporation under 27 *Del.C.* § 101, the Religious Societies Act. Apparently, the congregation was attempting to cure the defective incorporation filing of 1892. The second certificate dated December 19, 1905, is titled "Certificate of Incorporation of East Lake Methodist Episcopal Church, Incorporated," and provides that the corporation is organized pursuant to general corporation law.

The language of the December 5, 1905 Certificate of Incorporation provides that for the purposes of being incorporated, "such additional notices were given according to the manner presented in the discipline, rules and regulations of the Methodist Episcopal Church with which this said congregation is connected." Similarly, the Certificate of Incorporation under the general corporation law states that "a congregation of Christians having been organized ... for the purpose of worshiping Almighty God, according to the religion, faith, doctrines, rules, discipline, and usages of the Methodist Episcopal Church in the United States of America...."

On January 2, 1906, a confirmatory deed was recorded for the parcels acquired in 1892 with "East Lake Methodist Episcopal Church, Incorporated" as grantee, for the purpose of confirming and making good the title that may have been questionable because of the defective incorporation. On June 28, 1909, East Lake Methodist Episcopal Church, Incorporated acquired an additional parcel which adjoined the property already held. The parsonage is located on this property. Finally, in March 1928, East Lake Methodist Episcopal Church, Incorporated acquired a parcel from Elizabeth W. Russell and Charles G. Russell which contained a restriction that the property be held:

[i]n trust for the use of the East Lake Methodist Episcopal Church, Incorporated, subject to the doctrines, law, usages, and ministerial appointments of the Methodist Episcopal Church, as from time to time established, made and declared, by the lawful authority of said Church; and if said property shall be sold or encumbered, the proceeds of the sale or encumbrance shall be applied to the use aforesaid: subject, however, to the provisions of the law of the Church relating to abandoned Church property.

East Lake also acquired certain property interests through testamentary grants. In 1946, the Church acquired property, not at issue here, granted to East Lake under the terms of a will which provided that the property be "given to East Lake Methodist Episcopal Church ... to be put in Trust and only the interest taken and used to defray Pastor's salary, and when East Lake Church ceases to be a Church ... it shall go to help worn out preachers in M.E. Churches." Similarly, in 1985 the Church received property from the will of Grace M. Green, which provided that the property was "to be used by the governing body of said Church for general purposes...." The only other transaction in-

volving church property which is of note involves a mortgage between East Lake and one of its trustees. On June 29, 1995, shortly before the discontinuation of East Lake became effective, a mortgage was executed by "East Lake Methodist Episcopal Church, Incorporated," in favor of Naomi H. Bailey, one of the individual defendant-trustees in the amount of $65,-000, reciting the current church property and parsonage as collateral. This mortgage was not authorized by the Conference and was viewed by the Court of Chancery as questionable.

## A

The United Methodist Church is a religious body that is the result of many years of evolution. Its predecessors include the Methodist Episcopal Church and the Methodist Church. The Methodist Church was formed by the merger in the 1930s of the Methodist Episcopal Church, the Methodist Episcopal Church, South and the Methodist Protestant Church. In 1968, the United Methodist Church was formed by the further union of the Methodist Church and the Evangelical United Brethren Church United Methodist Church. The United Methodist Church views itself as connectional in structure with supervision exercised by regional conferences. The Conference was incorporated on November 22, 1940, "[t]o act in the capacity of trustee for the international religious denomination and organization now known as the Methodist Church...." Although it was incorporated under the name "Trustees of the Peninsula Annual Conference of the United Methodist Church, Inc.," in 1992 the Conference changed its name to "Trustees of the Peninsula–Delaware Annual Conference of the United Methodist Church, Inc."

Reflective of its connectional structure, the Book of Discipline of the Methodist Episcopal Church (the "Discipline") instructed churches to hold property in the corporate name according to statutes of the area and specified that the articles of incorporation provide that the "Society" shall be subject to the provisions of the Discipline. The Discipline also provided that the secular affairs of the corporation should be managed and controlled by a board of trustees, and that the corporation should have the power to acquire, hold, sell, and convey property. It further provided that all property acquired be deeded in the name of the corporation.

In addition to the legal documents supporting a connectional structure, the Conference presented evidence in the Court of Chancery of East Lake's affiliation with the United Methodist Church and the Conference. East Lake referred to itself as Eastlake United Methodist Church on the cover of its pamphlets for its 85th, 90th, 95th, and 100th anniversary services. East Lake was mentioned in the excerpts from reports and minutes of the Conference in the years between 1889 and 1913. The Conference minutes of 1889, in the Reports of the Presiding Elders, described the "lot ... in East Lake Park" as an important development because of the growth in the area. East Lake made annual reports to the Charge Conference. East Lake also participated at the conference at which the discontinuation resolution was adopted, and planned and celebrated a 105th anniversary of the ministry. East Lake considered the discontinuation a "divorce" from the United Methodist Church.

## B

The present strife was precipitated by the Conference's concern over the state of affairs and declining membership at East Lake. On June 26, 1994, there was an informational meeting to discuss the future of East Lake and its possible redevelopment, relocation, limited service or discontinuation. On August 2, 1994, a letter voicing concerns over East Lake was sent from Dr. James Seymour, then Conference Superintendent, to the Members of District Board of Church Location and Building. This letter referred to the ability of

East Lake to pay its pastoral obligations and its share of Charge responsibility and apportionments. In that same month, a meeting was held by the members of the Wilmington United Methodist District Board of Church Location and Building ("the Board") to discuss the situation. Although the Board expressed the view that the East Lake congregation should choose its future, the Board later advised the congregation of the problems facing the church and the Board's responsibility to review the status of any church whose membership drops below fifty.

In May of 1995, the Board again met with church members, at which time the Board indicated that it was going to recommend discontinuation. The Board's recommendation was ultimately adopted by the Conference and discontinuation of East Lake was authorized.

### III

The Court of Chancery examined at some length East Lake's history and its affiliation with the Conference. The court acknowledged the need to defer to church tribunals in church property disputes involving ecclesiastical issues but noted that such deference does not preclude the application of neutral principles of law to determine ownership issues. After a thorough evaluation of the relationship between East Lake and the Conference, the court concluded that, while record title has remained with East Lake since the initial acquisition of the properties in dispute, East Lake's affiliation with, and membership in, a general denominational church organization created an implied trust for the benefit of the general church. The Court of Chancery took particular notice of the confirmatory deeds that refer, in turn, to the certificates of incorporation expressing affiliation with the Conference. The court characterized an implied trust as one "for the maintenance and furtherance of the faith and creed of the denominational church at large." *Trustees of the Peninsula–Delaware Annual Conference of the United Methodist Church, Inc. v. East Lake Methodist Episcopal Church, Inc.,* Del.Ch., C.A. No. 14530, 1998 WL 83033, at \*5 (Feb. 13, 1998), *quoting Trustees of Pencader Presbyterian Church in Pencader Hundred v. Gibson,* Del.Supr., 22 A.2d 782, 787–88 (1941). In its finding of an implied trust, the court placed particular emphasis on language from an earlier Delaware case, *St. Nicholas Ruthenian Greek Catholic Church v. Bilanski,* Del.Ch., 162 A. 60, 63 (1932), holding that "there need be no express dedication" of church property in order for the property to be committed to the control of a parent church. *See also Pencader,* 22 A.2d at 787.

The appellant-trustees assert a broad attack on the Court of Chancery decision, alleging not only an erroneous application of trust law but a lack of standing by the Conference to seek the relief of dispossession of church property. In essence, the trustees maintain that the Court of Chancery's finding of an implied trust was based on an analysis of the evidence beyond "the four corners of the instruments of title" and the impermissible application of church doctrine contained in the Discipline. The Conference counters that the court correctly used neutral principles of law in determining the existence of an implied trust and that central holding not only provides the basis for an order of possession but also vitiates any legal basis for the trespass and interference claims against individual church officials and agents.

■ The Court of Chancery decision was directed to cross-motions for summary judgment with neither party disputing underlying material facts. Accordingly, our review is *de novo. Williams v. Geier,* Del.Supr., 671 A.2d 1368, 1375 (1996). Moreover, East Lake's attack on the Court of Chancery's application of the principles of implied trust present a clear question of law as to whether the court applied the appropriate legal standards. *See Gaffin v. Teledyne, Inc.,* Del.Supr., 611 A.2d 467, 474 (1992).

## A

In response to the Free Exercise and Establishment Clauses of the United States Constitution, courts must proceed with caution in resolving civil disputes within religious organizations.[2] To avoid impermissible inquiry into religious doctrine or practice, two approaches have emerged: the compulsory deference approach (also referred to as the polity approach), and the neutral principles of law approach.

The seminal case dealing with religious property disputes is *Watson v. Jones,* 80 U.S. (13 Wall.) 679, 20 L.Ed. 666 (1872). In *Watson,* the United States Supreme Court confronted a long-simmering quarrel between pro-slavery and abolitionist/federal government supporting factions of a Kentucky Presbyterian congregation over ownership of local church property. *Id.* at 722. In *Watson,* the Court announced a compulsory deference, or polity, framework to guide civil courts in the resolution of church property disputes. *Id.* at 727. This approach centered upon the organizational structure of the religious institution involved. The majority in *Watson* began its analysis by classifying church property disputes into three categories: express trust cases,[3] congregational church cases and hierarchical church cases. *Id.* at 722–23. If the church was hierarchical in nature, civil courts were instructed to defer to the decision of the appropriate church tribunal whenever "questions of discipline or faith, or ecclesiastical rule, custom or law have been decided." 80 U.S. at 727. The *Watson* Court found that a local congregation was hierarchically controlled if it was "a member of a much larger and more important religious organization ... under its government and control, and ... bound by its orders and

judgments." *Id.* at 726–27. When dealing with disputes brought by hierarchical churches, civil courts were to enforce the decision of the highest-ranking church decision-making body to which a dispute had been presented.

On the other hand, if the religious organization was primarily congregational in structure, a reviewing court was instructed to determine the right to use the property by the ordinary principles which govern voluntary associations, either by vote of a majority of its members or by "such other local organism as it may have instituted for the purpose of ecclesiastical government." *Id.* at 724–25. The *Watson* Court explained that if property was donated with specific instructions that it be used for the furtherance of certain religious tenets, courts should give effect to the terms of the legal instrument prescribing the donation. *Id.* at 723.

Central to the resolution of a religious dispute was the primary determination of the organizational structure of the religious institution before the court. The purpose of the inquiry was to decide, initially, whether a given religious organization was congregational (*i.e.,* independent of other ecclesiastical associations), or hierarchical and subject to authoritative rulings of the appropriate tribunal within the hierarchy. While deference to church authority may appear harsh at first blush, the *Watson* Court reasoned that those who join a church impliedly consent to (and are then bound by) its governing power. 80 U.S. at 729. *Watson* also indicated that members of the clergy were more qualified than the civil courts in resolving and interpreting ecclesiastical law and religious faith. *Id.* The *Watson* Court, concluding that the local Presbyterian congregation was part of a hierarchical church struc-

---

2. Although the controlling standards of judicial deference to religious disputes have evolved primarily from interpretations of the First Amendment to the United States Constitution, art. I, § 1 of the Delaware Constitution, enjoining "any magistrate ... in any case" from interfering with the free exercise of religious worship is of equal force. *See Pencader,* 22 A.2d at 790.

3. The parties do not contend that any express trust is at issue in this case.

ture, ordered deference to the policies of the General Assembly of the Presbyterian Church in the United States of America. *Id.* at 726, 733–34.

In subsequent rulings, the United States Supreme Court continued to establish limits on judicial determinations of religious congregation disputes. *See Bouldin v. Alexander,* 82 U.S. (15 Wall.) 131, 140, 21 L.Ed. 69 (1872) (in a congregational church an "expulsion of the majority by the minority [was] a void act"); *Gonzalez v. Roman Catholic Archbishop of Manila,* 280 U.S. 1, 16–17, 50 S.Ct. 5, 74 L.Ed. 131 (1929) (holding that there was subject matter jurisdiction in dispute relating to archbishop's refusal to appoint a candidate to chaplaincy position because he was seeking relief as beneficiary of a trust, but further finding that the determination of what the essential qualifications of a chaplain are and whether the candidate possesses them was an ecclesiastical matter which will be accepted as conclusive in secular courts); *Presbyterian Church in the United States v. Mary Elizabeth Blue Hull Memorial Presbyterian Church,* 393 U.S. 440, 449–50, 89 S.Ct. 601, 21 L.Ed.2d 658 (1969) (rejecting Georgia Supreme Court decision applying state law "departure-from-doctrine" test as the basis for declaring that general church had forfeited the benefit of an implied trust in disputed church property and recognizing that "there are neutral principles of law, developed for use in all property disputes, which can be applied" without violating the Establishment Clause).

The United States Supreme Court's second approach to ecclesiastical disputes, that of neutral principles of law, was first adopted by a majority of the Court in *Jones v. Wolf,* 443 U.S. 595, 99 S.Ct. 3020, 61 L.Ed.2d 775 (1979). While retaining the *Watson* rationale for restricting civil court entanglement in ecclesiastical matters, the neutral principles of law approach broadened the civil courts' inquiry by permitting examination of the secular provisions of religious documents, constitutions

and canons. *Id.* at 602–604. The provisions to be examined must be devoid of religious concepts, but articles of incorporation, trust instruments, deeds, and other instruments of ownership, are properly within the purview of the civil courts' inquiry. *Id.* at 604.

The neutral principles of law approach was given approval in an earlier decision of the United States Supreme Court in *Maryland and Virginia Eldership of the Churches of God v. Church of God at Sharpsburg, Inc.,* 396 U.S. 367, 90 S.Ct. 499, 24 L.Ed.2d 582 (1970); *see also, Jones,* 443 U.S. at 602–03, 99 S.Ct. 3020. In *Sharpsburg,* the Maryland Court of Appeals had resolved a dispute over church property by construing state statutes governing church property ownership, the language in the deeds conveying the property, charters of the church corporations, and church constitutional provisions regarding church property ownership and control. *Id.* at 367, 90 S.Ct. 499. In affirming the Maryland Court of Appeals, the *Sharpsburg* Court noted that Maryland's approach was constitutionally proper because it was devoid of "inquiry into religious doctrine." *Id.* at 368, 90 S.Ct. 499. In a concurring opinion, Justice Brennan noted that "a State may adopt *any* one of various approaches for settling church property disputes so long as it involves no consideration of doctrinal matters, whether the ritual and liturgy of worship or the tenets of faith." *Id.* (original emphasis).

The majority in *Jones v. Wolf* appears to have adopted the view expressed by Justice Brennan in *Sharpsburg,* but elaborated on the broader standard in observing:

[t]he neutral-principles method, at least as it has evolved in Georgia, requires a civil court to examine certain religious documents, such as a church constitution, for language of trust in favor of the general church. In undertaking such an examination, a civil court must take special care to scrutinize the document in purely secular terms, and not to rely on religious precepts in determining wheth-

er the document indicates that the parties have intended to create a trust. In addition, there may be cases where the deed, the corporate charter, or the constitution of the general church incorporates religious concepts in the provisions relating to the ownership of property. If in such a case the interpretation of the instruments of ownership would require the civil court to resolve a religious controversy, then the court must defer to the resolution of the doctrinal issue by the authoritative ecclesiastical body.

443 U.S. at 604, 99 S.Ct. 3020.

The *Jones* Court explained that the neutral principles approach was permissible because it was grounded upon secular trust and property concepts. *Id.* at 602–03, 99 S.Ct. 3020. This foundation allowed civil courts to avoid entanglement with doctrinal matters while still permitting review of relevant secular evidence in order to resolve church property disputes. *Id.* at 603, 99 S.Ct. 3020. The *Jones* Court also added that application of neutral principles would permit churches to order their affairs in advance of a schism or property dispute through "appropriate reversionary clauses and trust provisions" that could reflect the intentions of a church and its members. *Id.* at 603–04, 99 S.Ct. 3020.

Although *Jones* was a 5–4 decision, its central holding, that courts may apply neutral principles of law to resolve church property disputes which do not require courts to defer to the decision of that church's governing body, has found general acceptance in subsequent years at both the state and federal levels. Several of these rulings have involved the question of whether a trust relationship may serve to divest a local church of control of its property. *See, e.g., Bishop and Diocese of Colorado v. Mote,* Colo.Supr., 716 P.2d 85, 96, 103–09, *cert. denied,* 479 U.S. 826, 107 S.Ct. 102, 93 L.Ed.2d 52 (1986) (applying neutral principles of law approach in determination of trust for benefit of the general church); *Babcock Memorial Presbyterian Church v. Presbytery of Baltimore of the United Presbyterian Church in the United States,* Md.Ct.App., 296 Md. 573, 464 A.2d 1008, 1016–17 (1983), *cert. denied,* 465 U.S. 1027, 104 S.Ct. 1287, 79 L.Ed.2d 689 (1984) (using both a polity and neutral principles of law analysis); *Fonken v. Community Church of Kamrar,* Iowa Supr., 339 N.W.2d 810, 812, 819 (1983) (holding that finding of implied trust in the general church was correct under both neutral principles of law and compulsory deference approaches).

Other courts applying neutral principles of law have rejected the claim of a trust relationship between a local and a general church. *See, e.g., Bjorkman v. Protestant Episcopal Church in the United States of America of the Diocese of Lexington,* Ky. Supr., 759 S.W.2d 583, 586–87 (1988) (using neutral principles of law approach to find no evidence of either an express or constructive trust in favor of the general church); *First Presbyterian Church of Schenectady v. United Presbyterian Church in the United States,* 62 N.Y.2d 110, 476 N.Y.S.2d 86, 464 N.E.2d 454, 459–60, *cert. denied,* 469 U.S. 1037, 105 S.Ct. 514, 83 L.Ed.2d 404 (1984) (applying neutral principles of law approach to find no express or implied trust in favor of the general church).

In sum, deference and neutral principles of law enjoy a parallel relationship in the resolution of property rights involving churches. Some decisions, particularly those emanating from the highest level of authority in hierarchical churches where church law clearly defines property rights, require deference. Yet, perhaps a majority of property dispute questions in congregational or limited hierarchical church organizations may be decided by civil courts using "*any* one of various approaches for settling property disputes so long as it involves no consideration of doctrinal matters." *Jones,* 443 U.S. at 602, 99 S.Ct. 3020 (original emphasis).

### B

Delaware decisional law has been consistent with the development of the deference

and neutral principles of law approaches as they have evolved at the federal constitutional level. In *Pencader*, this Court, acknowledging the deference standard then mandated by *Watson*, refused to examine entitlement to church property on the basis of differences over church doctrine. 22 A.2d at 790. This Court ruled that where "the property right turns upon a determination of the correctness of religious creed or teaching, the judgment of the supreme ecclesiastical tribunal is conclusive." *Id.* In upholding a finding of title in the general church over the claims of the trustees of the local congregation, this Court noted that incorporation under Delaware's Religious Societies Act of 1787 by a local church, "in affiliation with and a constituent of a general denominational church" would not alter the fact that "the property acquired by it in general grant was held by the corporate body ... in the sense of a trust for ... the denominational church at large of which the local congregation was but a component." *Id.* at 787–88.

Earlier decisions from the Court of Chancery, while preceding *Jones*, seem to blend a deference approach with a limited application of neutral principles of law. In *St. Nicholas*, the Chancellor, in resolving a dispute between factions in a hierarchical church, nonetheless approved application of the concept of an implied trust in precluding the attempted seizure of church property by the local congregation over the objection of the parent church. 162 A.2d at 63. In a later case, *Bouchelle v. Trustees of the Presbyterian Congregation at the Head of Christiana in New Castle County*, Del.Ch., 194 A. 100, 103, 105 (1937), in addressing a property dispute between the local church and general organization, the court adopted a clear deference approach in declining to address an adjudication by the general organization regarding a charge of heresy, and thereby rejected the efforts of "seceders" to wrest church property away from "its long established connection" with the larger denomination.

Although this Court has not had the occasion directly to pass upon the appropriate application of the neutral principles of law approach, the Court of Chancery has applied that concept with different results. In *Mother African Union First Colored Methodist Protestant Church v. Conference of African Union First Colored Methodist Protestant Church*, Del.Ch., C.A. No. 12055, 1991 WL 85846 at *6 (May 16, 1991), *cert. denied*, 502 U.S. 908, 112 S.Ct. 302, 116 L.Ed.2d 245 (1991), the Court of Chancery rejected the claims of entitlement to local church property asserted by the church conference that was arguably hierarchical. The court, applying neutral principles of law, concluded that legal title had originated in the local church prior to affiliation, and the local church, neither expressly nor by affiliation, had evidenced an interest to transfer the assets of the local church. *Id.* at *7–8. In *African Methodist Episcopal Church, Inc. v. John Wesley United Church, Inc.*, Del. Ch., C.A. No. 1167–K, 1994 WL 643178 at *5–7 (Nov. 2, 1994), the Court of Chancery, again applying neutral principles of law in a hierarchical context, rejected the claim of a parent organization. The court noted that the original deed conveying the property to local trustees made no reference to adherence to a larger church group or faith and that a loose affiliation at a later date with the hierarchical church and the subsequent execution of a partial conveyance of the property without the authorization or participation of the parent organization evidenced a lack of entitlement in the parent church. *Id.*

The concept of an implied trust relationship between a constituent church and the Conference was applied by Chancellor Seitz in a *pre-Jones* decision involving disputing members of the Methodist Church, the same religious body involved here:

> By joining themselves to the national Methodist Church, the members of a local congregation tacitly agree that they will be bound by the governing authority of the national body. Thereafter when some action is taken by that

governing authority, the civil courts, in the absence of some irregularity in the procedure under which the acts were done, will not interfere.

*Trustees of The Peninsula Annual Conference of the Methodist Church, Inc. v. Spencer,* Del.Ch., 183 A.2d 588, 595 (1962).

In ruling in favor of the Conference, the court concluded that "whatever interest the Trustees or the Members [of the local church] claim for themselves in the property by virtue of a trust is held by them for the benefit of The Methodist Church at large, subject to the Discipline of the Church." *Id.*

## C

In the present case, the Court of Chancery carefully defined the limits of its analysis and concluded that it could determine, under neutral principles of law, whether the East Lake property was subject to control by the Conference under an implied trust theory.

The Court of Chancery analyzed the existence of an implied trust in permitted fashion: examining the circumstances of creation, the continued use of the property and the relationship between the parties. The court specifically considered the real property deeds, East Lake's certificates of incorporation, the Discipline, and the characteristics of the affiliation between East Lake and the Conference to determine the existence of an implied trust.

■ An implied trust has two forms, constructive and resulting, with the latter arising from the presumed intention of the parties, based on the circumstances surrounding the particular transaction.[4] A resulting trust arises where a person conveys property under circumstances that raise an inference that the person does not intend the person taking or holding the property to have the beneficial interest in the property. 5 Austin Wakeman Scott, Scott On Trusts § 404.1, at p. 6, (4th ed., 1989). The presumed intention of the par-

ties guides the resulting trust. *Adams v. Jankouskas,* Del.Supr., 452 A.2d 148, 152 (1982).

■ To find an implied trust in this case, the court was required to ascertain the intention of the parties without resort to determinations of doctrine or faith. The existence of an implied trust may be reached through reliance on neutral principles of law, specifically, evidence found in the deeds, corporate charters, church documents, and state statutes. In church property control disputes, relevant evidence of the intent to create a trust interest should not be rejected "solely because it does not relate exclusively to or contain the language of traditional property and trust law." *Mote,* 716 P.2d at 101.

■ An implied trust was correctly found here on the basis of neutral principles of law. East Lake was incorporated as a general corporation in December 1905, and its certificate recited an intention to operate in accordance with the "religion, faith, doctrines, rules, discipline and usages" of the predecessor to the United Methodist Church. This dedication of purpose is similar to the deed recital considered of importance by the court in *Pencader* that the property should go to the congregation "according to the Presbyterial Rule." 22 A.2d at 785. *Pencader* may be distinguished on the ground that there the property deed itself dedicated the property to the church, as distinct from the case here where the actions of the congregation dedicated the property to the hierarchical church. Nevertheless, the intent is the same—that the parent church be the beneficiary of an ownership interest.

If this case is compared to *Bouchelle,* it becomes clear that although the language of the deed carries great weight in determining whether a property has been devoted to the church or the local congregation, the deed itself is not dispositive. The *Bouchelle* court found the claim of the

---

4. A constructive trust is one imposed by a court of equity as a remedy to correct the unlawful vesting, or assertion of, legal title.

*Hogg v. Walker,* Del.Supr., 622 A.2d 648, 651–52 (1993). It has no application here.

dissenting congregation members not supportable, as compared to the claims made in *St. Nicholas Ruthenian,* because the property in question was specifically conveyed by lease to the parent church. *Bouchelle,* 194 A. at 105. The property in *St. Nicholas Ruthenian* was purchased by funds raised by a congregation composed of local adherents, under the guidance of the Bishop. *St. Nicholas Ruthenian,* 162 A. at 61. As in *St. Nicholas Ruthenian,* the property in this case was dedicated, by those who held it, through their constant association with, and explicit recognition of, the parent church.

Although the United Methodist Church may be viewed as hierarchical in structure, that factor does not control the analysis here, nor raise the level of deference. This is so because the original conveyances of title did not provide for an express interest or immediate control by the Conference which, *qua* conference, did not exist until 1940. The religious entity which the Conference later came to represent in governance did exist, however, as a specific religious group adhering to the tenets of Methodism. Indeed, it is this predecessor in belief that East Lake's 1905 Certificate of Incorporation refers to as the "Methodist Episcopal Church" to whose "discipline, rules and regulations ... with which this said congregation is connected." The later confirmatory deeds also recite that connection. Except for the aberrational 1995 mortgage undoubtedly prompted by the impending order of discontinuation, the trustees of East Lake have made no effort to convey or to encumber church property in situations requiring the participation of the Conference.

As the Court of Chancery noted, transactions in which East Lake either conveyed or mortgaged portions of its property either acknowledged the express trust interest of the Conference or did not require the consent of the Conference. More importantly, there is no claim by the Conference that any of these transactions were contrary to the rules, regulations and Discipline of the United Methodist Church, as would the attempt by the trustees to

exercise local control following a resolution of discontinuation adopted by the Conference.

We agree with the analysis conducted by the Court of Chancery under its neutral principles of law approach. While the present trustees may desire to disassociate themselves and the congregation they purport to represent from the United Methodist Church, as presently constituted and organized, they are not free to nullify the affiliation accomplished by previous generations of East Lake church members over more than 100 years. More importantly, they may not negate the legal relationship established in the form of an implied trust based on the language of the conveyances, the recitals and the acknowledgments in the incorporation documents, and the adherence to the Discipline of the parent church. Those documents, and the conduct of the members of East Lake over the course of many years, demonstrate a unity of purpose between the local church and the general church that the property held by the local church be dedicated to, and used for, the advancement of the interests of the United Methodist Church as governed by the Conference.

## IV

■ East Lake also claims error in the Court of Chancery's denial of its affirmative defenses, counterclaims and third party action. But the merit of these claims is controlled by the central holding that the church premises and personal assets are held in an implied trust for the Conference. As the beneficiary of that trust, the Conference, both as a matter of trust law and under its own Discipline, is authorized to dictate its future use.

■ Our affirmance of that bedrock ruling supports the following summary determinations in this appeal: (1) there is no merit to East Lake's statute of limitations defense in view of the prompt action of the Conference in initiating this action for possession and quiet title on September 13, 1995, within three months of the purported effort by the East Lake trustees to exe-

cute the mortgage in favor of Naomi Bailey—an act inconsistent with the implied trust benefit owed the Conference; (2) the standing of the Conference to initiate the Court of Chancery action as the beneficiary of the implied trust is not open to question (*see Pencader*, 22 A.2d at 786); (3) the Court of Chancery's injunctive order implementing its decision on the merits of the Conference claim did not exceed that court's discretionary authority to award complete relief against those resisting the Conference's assertion of ownership over the assets, real and personal, of East Lake; and (4) the Court of Chancery correctly dismissed East Lake's counterclaim and third party claims as baseless in view of the clear right of the Conference, acting through its agents and employees, to take possession of the church premises.

The judgment of the Court of Chancery is AFFIRMED.