**COURT OF CHANCERY**
**OF THE**
**STATE OF DELAWARE**

LOREN MITCHELL
MAGISTRATE IN CHANCERY

LEONARD L. WILLIAMS JUSTICE CENTER
500 N. KING STREET, SUITE 11400
WILMINGTON, DELAWARE 19801-3734

May 2, 2025

Timothy S. Ferry, Esquire
Timothy R. Akers, Jr., Esquire
Ferry Joseph, P.A.
1521 Concord Pike, Suite 202
Wilmington, DE 19803

Charles J. Durante, Esquire
Regina S. Schoenberg, Esquire
Connolly Gallagher LLP
1201 N. Market Street, 20th floor
Wilmington, DE 19801

RE: *Barbara Thompson v. William E. Barrow, et. al.*,
C.A. No. 2023-0410-LM

Dear Counsel:

Through this post-trial report, I resolve a dispute between siblings on the actions taken by William Barrow while he served as his father, Ralph Barrow's, power of attorney. Barbara Thompson, one of the daughters of Ralph Barrow, filed this litigation alleging mismanagement, self-dealing, and a breach of fiduciary duties by her brother while he served as their father's power of attorney. Although Ralph Barrow has since passed away, his estate remains open while his daughter seeks transparency and potential accountability into her brother's actions.

## I. FACTUAL BACKGROUND[1]

Ralph W. Barrow (hereinafter, "Decedent") and his wife, Anna Lee Barrow (hereinafter, "Ms. Barrow"), had four children, who were all active in the long and difficult process of providing end of life care for each of their aging parents. Ms. Barrow predeceased her husband on February 9, 2020, after being diagnosed with Lymphoma Leukemia.[2] A little over a year later, Ralph W. Barrow (hereinafter, "Decedent") died, testate, on June 15, 2021, survived by his four children: Barbara Thompson (hereinafter, "Petitioner"), William E. Barrow (hereinafter, "Respondent"), Rob Barrow, and Deborah Corrado (hereinafter, "Ms. Corrado").[3] The Decedent's cause of death was Alzheimer's dementia.[4]

---

[1] The facts in this report reflect my findings based on the record developed at trial January 7, 2025, and January 8, 2025. See Docket Item ("D.I.") 43. I grant the evidence the weight and credibility I find it deserves. Citations to the trial transcripts are in the form "Tr. #." D.I. 47 and 48. The parties' jointly submitted exhibits are cited as "JX __." JX A- M and JX O-Q were admitted without objection. In addition, Petitioner's Exhibits ("PX") 1-12 and Respondent's Exhibit ("RX") 1 were admitted during witness testimony.

[2] Tr. 18:2-7.

[3] Tr. 23:19-21.

[4] Tr. 23:22- 24:5.

### A. Decedent's Declining Health

The Decedent started exhibiting signs of a mental decline in 2017.[5] The Decedent was still driving in the beginning of 2018 but became increasingly more forgetful as the year progressed and stopped driving by the end of 2018.[6] The Decedent was diagnosed with Lewy Body Dementia at one of his doctor's appointments between October 31, 2017 and January 18, 2018.[7] Sometime after his diagnosis, the Decedent's daughters, Ms. Corrado and Petitioner, signed the Decedent up for "Meeting of the Minds", a memory class at the Newark Senior Center, which he attended through the end of 2018.[8] The Decedent's wife, Ms. Barrow, was caring for her husband in their home until her own health declined and she herself was no longer able to live without assistance.[9] Ms. Barrow subsequently moved into Petitioner's house on September 26, 2019, where she was taken care of until she passed away.[10] Ms. Barrow's physical decline and her husband's mental

---

[5] Tr. 221:14-21.

[6] Tr. 118:14-20; Tr. 358:8-20.

[7] PX 2; PX 12; Tr. 220:10-21.

[8] Tr. 30:3-19; Tr. 300:14-301:9.

[9] Tr. 261:12-21.

[10] Tr. 260:21-261:7; Tr. 261:22-262:4.

and physical decline, prompted their children to have the decedent to be admitted to a memory care unit in an assisted living facility in October 2019.[11]

## B.    Estate Planning

More than 25 years before his death, Decedent began his estate planning. On June 3, 1992, Decedent and Ms. Barrow, with the assistance of an estate planning attorney, executed their respective wills and trusts.[12] The Decedent and his wife had functionally the same estate planning documents leaving the entirety of their property to their spouse and then thereafter in equal shares to each of their four children.[13] Petitioner and Respondent are named Co-Executors of each of their parents' estates.[14] Pursuant to Article 20 of the Decedent and his wife's Trusts, Petitioner and Respondent were also named as Co-Trustees.[15] Article 4 of Decedent's Trust directs that the corpus "upon the death of his wife" shall be distributed outright and free of trust, to his surviving issue, per stirpes.[16]

---

[11] PX 2; Tr. 29:20- 31:1; Tr. 207:8-10; Tr. 260:16-261:21.

[12] Tr. 19:1-22; Tr. 27:19-28:2; JX M.

[13] Tr. 22:5-11; Tr. 27:22-28:6; Tr. 29:10-19; Tr. 257:2-258:1.

[14] Tr. 20:8-13; Tr. 28:23-29:1; Tr. 257:11-22; Tr. 270:18-19.

[15] Tr. 28:11-14; Tr. 257:19-22; JX M.

[16] JX M at 5.

After the death of their mother, the Petitioner and Respondent acted as the Co-Executors of their mother's estate because their father was not capable of doing so at the time of her death.[17] Ms. Barrow's Estate was opened on May 4, 2020, and was closed on March 26, 2021.[18] The Decedent's estate remains open as of the time of trial.[19]

### C. The 2009 and 2018 Powers of Attorney

Approximately seventeen years after executing his will and trust documents, on June 4, 2009, the Decedent executed a durable power of attorney (hereinafter, the "2009 Power of Attorney"), first nominating his wife, then Ms. Corrado, then Rob Barrow, as his agents.[20] Respondent, Ms. Corrado, and Rob Barrow were all unaware of the original 2009 Power of Attorney until a family meeting with their parent's estate attorney, after the Decedent had executed his new power of attorney in 2018.[21]

Through the end of 2017 and into the beginning of 2018, all four siblings had begun discussing with one another the need for their father to execute a power of

---

[17] Tr. 20:14-19.

[18] PX 10; D.I. 42 at 8.

[19] Tr. 29:2-4; Tr. 270:15-19.

[20] JX L.

[21] Tr. 39:21-40:2; Tr. 43:9-17; Tr. 216:19-217:7; Tr. 255:15-24.

attorney due to his dementia.[22] The siblings all seemed to agree or expect that the Respondent should be named Agent.[23] Unaware of the 2009 Power of Attorney, and feeling a sense of urgency with their father's declining health, the siblings agreed it was important to make sure a Power of Attorney was put into place.[24]

Nine years after executing the 2009 Power of Attorney, Decedent executed a new durable power of attorney on February 1, 2018 (hereinafter, the "2018 Power of Attorney") which nominated the Respondent as his sole agent.[25]

On February 1, 2018, Respondent, the Decedent, and Ms. Barrow gathered at the Petitioner's husband's veterinary office, and each executed new powers of attorney.[26] The Petitioner was not present.[27] The documents were notarized by a notary that worked with the Petitioner at the veterinary hospital.[28] The Petitioner testified that she was under the impression that her parents were signing banking documents and was not aware at the time that the 2018 Power of Attorney was

---

[22] Tr. 60:13-61:11; Tr. 215:11-216:6; Tr. 327:24-329:2.

[23] Tr. 217:8-21; Tr. 328:12-20.

[24] Tr. 43:22-44:24.

[25] JX K at 2.

[26] Tr. 59:4-21; Tr. 62:5-23.

[27] Tr. 251:4-7.

[28] Tr. 59:18-60:7; Tr. 251:23-253:23; Tr. 327:21-328:20.

among the documents that were being notarized, but did organize her mother, father, and brother coming and using the notary at her husband's office.[29]

The 2018 Power of Attorney designated the Respondent as the Decedent's Agent and granted him broad power over his father's finances, while also mandating that the Respondent prepare written, semi-annual, reports to the Petitioner on all income received and expenses incurred during each 6-month period in which the Respondent was acting as Agent of the Decedent.[30] The Respondent, who served as his father's Agent for a little over three years, never sent any formal periodic reports to the Petitioner as directed in section 5 of the 2018 Power of Attorney.[31]

### D. Respondent's Actions as Power of Attorney

#### 1. Management of Decedent's Assets

By September 2019, the Respondent was managing all of his father's finances.[32] The Respondent's parents had two vehicles, a 2010 Dodge caravan and a 1998 Ford Ranger.[33] The Respondent would drive the 2010 Dodge for the benefit

---

[29] Tr. 252:15-253:23.

[30] JX K.

[31] JX K; Tr. 58:1-21; Tr. 333:23- 334:23.

[32] Tr. 173:16-18.

[33] Tr. 116:9-12.

of the Decedent and for sporadic personal use. [34] The Respondent also used his father's funds to pay for repairs on the vehicles.[35] Both cars were sold to CarMax, the 2010 Dodge in March 2021 and the 1998 Ranger soon after that.[36]

The Respondent, by signing on his father's behalf, transferred to himself the Decedent's black tag low digit Delaware license plate, PC 1145, from the 2010 Dodge Caravan to himself when he sold the car in March 2021.[37] There was a third vehicle, jointly owned by the Decedent and Ms. Barrow, with a low digit Delaware license plate number that was sold in relation to the handling of Ms. Barrow's estate, and this low digit tag was given to Rob Barrow by Respondent who again signed on his father's behalf.[38]

The Decedent had two IRA investment accounts of his own. One was a larger investment account that was originally managed by a company called First Financial, until Respondent moved the investment account to Creative Financial because the company was more local, which would make it easier to pay for the Decedent's

---

[34] Tr. 116:13-24; Tr. 117:7-118:9.

[35] *Id.*

[36] Tr. 118:21-119:14.

[37] Tr. 119:15-120:24.

[38] Tr. 121:4-122:9.

healthcare and living expenses.[39] The other IRA account was one the Decedent opened originally with USAA that was later transferred to Victory Capital Management (VCM).[40] The Decedent had two life insurance policies, one was managed by Prudential and the other was managed by MetLife.[41]

The Respondent used his parent's two houses, located in Newark and Ocean View, Delaware, in 2020 after his mother had died and while his father was in the care facility, as his bases of operation to manage his father's affairs.[42] The Respondent was using his time at the properties for the general upkeep of the houses such as mowing the grass, getting the mail, and other general maintenance.[43] When the Respondent was traveling to and from each of these properties he was driving his father's car and was using his father's account to keep the homes stocked with groceries and alcohol.[44]

---

[39] Tr. 79:18-80:24.

[40] Tr. 81:9-16.

[41] Tr. 81:17-82:5.

[42] Tr. 76:13-16.

[43] Tr. 76: 16-77:1.

[44] Tr. 77:2-20.

For approximately 13-14 months, the Respondent's son, Brian, temporarily lived at the Decedent's home.[45] The Decedent also received rental payments from Brian because he was living in the Decedent's home and driving the Decedent's truck with the Respondent's permission.[46] The Respondent's son was paying $600 a month in rent for his time living in the home.[47] Ms. Corrado and Respondent were primarily managing the rental agreement for Respondent's son living in the home and both claimed that they felt it was beneficial to have someone living at the property to maintain it.[48] The Respondent seemed unsure of where the rental payments for the 13 or 14-month period when his son was living there were being deposited, with some testimony claiming the rent had been deposited into his Mother's joint account she had with his father and Petitioner, and other evidence presented indicating some of the rental payments had been deposited into the joint M&T Bank account the Respondent had with his father.[49]

---

[45] Tr. 314:11-315:9.

[46] Tr. 224:15-225:1; Tr: 128:11-13.

[47] Tr. 128:5-17; Tr. 181:16-19; Tr. 353:7-24.

[48] Tr. 353:7-24.

[49] Tr. 128:11-129:23; PX 11.

## 2. Joint Accounts

The Respondent opened a joint bank account for himself and his father with M&T Bank on July 23, 2019 (hereinafter, "Joint Account").[50] The Joint Account was not designated as a power of attorney account.[51] The Respondent testified that he told M&T Bank when the account was opened that he needed an account that he could use for his father and M&T Bank did not recommend a power of attorney account.[52]

The reasoning for opening the Joint Account was for the Respondent to manage his father's finances separately from his mother's finances, which at that time were comingled in another M&T Bank joint account with his parents and the Petitioner (hereinafter, "Mother's Account").[53] The Mother's Account was originally where all of Decedent's social security funds were being deposited but these funds were later changed to be deposited into the Joint Account after it was

---

[50] Tr. 103:4-20; PX 7.

[51] Tr. 102:6-13.

[52] Tr. 101:24-102:9.

[53] Tr. 97:20-98:10.

opened.[54] After the Respondent opened the Joint Account, the Mother's Account was intended to primarily be used to manage their mother's assets.[55]

The Petitioner was added as a co-account holder on the Joint Account in January 2021.[56] Both Petitioner and Respondent had access to the account information on the Joint Account and Mother's account which was evidenced by testimony that they have both been using the same online login information to respectively manage and view both the Joint Account and Mother's Account.[57] Eventually all but $100 of the funds from the Mother's Account were transferred to the Joint Account and remain there as of the time of the litigation.[58]

### 3. Distributions to the Siblings

On October 22, 2020, the Respondent executed a disclaimer on the Decedent's behalf of his rights to Ms. Barrow's home located in Newark, Delaware.[59] This home was the Decedent and his wife's primary residence but was solely in the name of

---

[54] Tr. 99:3-11.

[55] Tr. 97:20-98:10.

[56] Tr. 113:9-114:5; Tr. 266:18-267:18; PX 11 at 17-18.

[57] Tr. 171:2-172:7; Tr. 284:4-285:1.

[58] Tr. 264:20-265:15. The parties have stipulated to the funds in the joint account being an asset of the Decedent's Estate. Tr. 369:10-15; Tr. 369:18-370:1. I will not address any issues as to the ownership of such funds herein.

[59] Tr. 179:13-16.

Ms. Barrow.[60] The property would have passed to the Decedent according to the terms of Ms. Barrow's will at her death, however the effect of the disclaimer resulted in the property passing to the Petitioner and his siblings.[61] The Respondent claims to have approved of this disclaimer on his father's behalf with the consultation of his siblings and at the direction of his parent's estate attorney.[62] The Newark property was eventually sold in early 2022, after a lengthy process through 2020 and into 2021 of cleaning out the home.[63] The proceeds from the sale of the house were equally distributed among all four siblings.[64]

The Decedent owned a beach house in Ocean View, Delaware, which in the 1990's he had rented out and then was used by the family on a shared basis until it was sold to the Petitioner in 2022.[65] The Property was appraised and sold to the Petitioner for $640,000 with the proceeds split equally among the siblings.[66]

---

[60] Tr. 25:7-13.

[61] Tr. 25:7-13; Tr. 74:21-75:1.

[62] Tr. 75: 4-5; Tr. 179:19-180:4.

[63] Tr. 180:23-181:24.

[64] Tr. 181:19-182:12.

[65] Tr. 208:8-209:6; Tr. 344:1-5.

[66] Tr. 194:1-9; Tr. 208:8-23; Tr. 231:15-232:16.

Ms. Barrow had an IRA account with USAA and named the Decedent as the beneficiary.[67] On January 27, 2021, the Respondent managed the transfer of those funds to the Joint Account, depositing $37,000 which was the amount remaining after taxes were withheld from the original $43,000.[68] In February 2021, the Respondent, acting on his father's behalf, renounced his father's interest in the funds and then wrote four checks, one for each sibling including himself, to be paid from the Joint Account amounting to $9,250.[69]

The Decedent had a life insurance policy with Prudential Insurance Company.[70] In February 2021, the Respondent, using the authority granted to him to act on his father's behalf by the 2018 Power of Attorney, named himself as the sole beneficiary of the Decedent's Prudential Life Insurance.[71] The Respondent claimed his reasoning for doing this was to streamline the process of distributing the funds from the life insurance account into the Joint Account so that when the time came the funds could be distributed equally by check to each of the four siblings.[72]

---

[67] JX H; JX I; Tr. 14:15-23.

[68] JX I; Tr. 15:9-16:2.

[69] Tr. 16:3-17:18; Tr. 311:5-312:22.

[70] Tr. 87:20-22; Tr. 226:8-11.

[71] JX J; Tr. 87:23-88:7.

[72] Tr. 88:10-89:2.

In November 2021, the Prudential Life insurance funds, amounting to $8,200, were deposited into the Respondent's personal bank account, and then the Respondent wrote three checks for $2,045 to each of his siblings from his personal account.[73] The Petitioner received her purported share from her father's Prudential account but never received the Prudential documentation from the Respondent that revealed the amount of the disbursement.[74]

### 4. Decedent's VCM Account

The Decedent's VCM Account was an IRA account that was originally opened with USAA but was then transferred to a different servicer, Victory Capital Management, sometime during 2020 with access to the account through VCM beginning on November 9, 2020.[75] The Respondent claims that when he logged in to view the account, while it was still being serviced by USAA, he learned that he was named as secondary beneficiary, with his mother being named as primary beneficiary.[76] The Respondent claims to have immediately informed his siblings at a family meeting in July 2020 that he was named beneficiary on the VCM Account.

---

[73] Tr. 94:20-96:10; Tr. 227:4-19.

[74] Tr. 269:17-24.

[75] JX Q.

[76] Tr. 144:22-145:5; Tr. 149:24-150:4.

Ms. Corrado claims to have learned of this fact at the same family meeting, however both the Petitioner and Rob Barrow claim to have been unaware of this fact until the Respondent filed his answer in this action.[77] The Respondent and Ms. Corrado claim that at the family meeting when the Respondent informed his siblings, he explained that it was his plan to distribute the funds from the account equally among all four siblings but changed his mind when his sister filed this action.[78]

The Respondent, because he needed to do so, created a new online account with VCM in November 2020.[79] The Respondent claims that when he first logged onto the new online account through VCM he was prompted to identify the primary beneficiary designation on the account, which he reflected as himself since his mother had passed.[80] Presently, the respondent is listed as both the primary and secondary beneficiary on the VCM Account.[81] Neither the Respondent nor the Petitioner were able to provide any of the original USAA documentation that identified who the original beneficiary designations were.[82]

---

[77] Tr. 145:1-11; Tr.184:22- 186:6; Tr. 313:2-314:5; Tr. 234:22-235:9; Tr. 270:20-271:3.

[78] Tr. 166:7-22; Tr.186:7-187:3; Tr. 313:2-314:5.

[79] JX Q; Tr. 146:7-21; Tr. 188:17-20.

[80] Tr. 138:3-14; Tr. 146:22-147:2; Tr. 190:4-11.

[81] JX G at 9; Tr. 189:9-190:11.

[82] Tr. 158:14-159:9; Tr. 187:4-21.

The VCM Account funds have since been distributed to the Respondent with the original distribution amounting to $43,147.82.[83] The Respondent has reinvested the funds into a beneficiary IRA under his own name with Creative Financial where the investment has grown to an estimated $48,000.[84]

### E.    Procedural Posture

The Petitioner filed the petition presently at issue on April 10, 2023.[85] The Respondent filed an Answer on June 20, 2023.[86] A two-day trial was held on January 7, 2025, and January 8, 2025.[87] Per the court's directions, the parties submitted their closing statements in writing January 10, 2025.[88]

## II.    ANALYSIS

Barbara Thompson brought this action against her brother requesting the Court find that he breached fiduciary duties owed as Agent of their father under the 2018 Power of Attorney designation for engaging in self-dealing transactions and for failing to provide regular financial accountings to the Petitioner as directed in the

---

[83] Tr. 134: 2-9.

[84] Tr. 134:8-17; Tr. 137:18-22.

[85] D.I. 1.

[86] D.I. 10.

[87] D.I. 43.

[88] D.I. 44; D.I. 45.

2018 Power of Attorney.[89] Petitioner claims that Respondent has been unjustly enriched by engaging in self-dealing transactions and requests that the Court order an accounting and find the Respondent liable to the Decedent's estate for all unaccounted for assets and any losses attributable to any breaches of fiduciary duty.[90]

In short, I find Respondent has breached his fiduciary duty owed under his father's power of attorney for failure to provide regular accountings to Petitioner, for using his status as Agent to transfer his father's low digit Delaware license plate to himself, for using his father's vehicles for personal use, and for using funds from the Joint Account to pay for groceries and alcohol for his personal consumption. I do not find that the Respondent breached his fiduciary duty, nor was he unjustly enriched, through the circumstance surrounding his status as beneficiary of his father's VCM Account. For reasons further explained below I find it appropriate to order an accounting on all of Decedent's assets under the control of the Respondent during his time acting as Agent under the 2018 Power of Attorney and enter

[90] Tr. 1.

[90] Tr. 1.

judgement in favor of the Decedent's estate for all unaccounted-for assets and all damages resulting from Respondent's breaches of fiduciary duty as detailed herein.[91]

### A. I find that Petitioner has successfully met her burden in part in her claim that Respondent has breached his fiduciary duty.

To be successful in a claim of breach of fiduciary duty, two elements must be proven by the Petitioner by a preponderance of the evidence: "(1) that a fiduciary duty existed and (2) that the defendant breached that duty."[92] When acting as an agent under a personal power of attorney, that agent owes duties enumerated under Title 12 of the Delaware Code, Section 49A-114, which includes the duty to act in good faith, duty to act in the principal's best interest, and the duty of loyalty.

"An attorney-in-fact assumes the obligations of a fiduciary. This fiduciary relationship, comparable to that created in a formal trust, subjects the holder of a power of attorney to a duty of loyalty obligating her to act in the best interests of her principal in exercising such power."[93] "An attorney-in-fact, under the duty of

---

[91] I decline to specifically address the Respondent's conduct in disclaiming the Decedent's rights in the proceeds from the sale of the Newark property and naming himself as beneficiary of the Decedent's Prudential investment account to facilitate distribution of those funds equally amongst the four siblings as these transactions do not appear to be in dispute and any discrepancies as to these distributions will be resolved through the ordered accounting.

[92] *Sachs v. Sachs*, 2023 WL 2379389, at *10 (Del. Ch. Mar. 7, 2023) (citing *Beard Research, Inc. v. Kates*, 8 A.3d 573, 601 (Del. Ch. 2010)).

[93] *Coleman v. Newborn*, 948 A.2d 422, 429 (Del. Ch. 2007).

loyalty, always has the obligation to act in the best interest of the principal unless the principal voluntarily consents to the attorney-in-fact engaging in an interested transaction after full disclosure."[94] "[S]elf-dealing occurs when the fiduciary has a personal interest in the subject transaction of such a substantial nature that it might have affected [her] judgment in material connection."[95] A self-dealing transfer is voidable.[96]

Here, it is established that a fiduciary duty existed because it is undisputed that the Respondent was acting as Agent of his father under the 2018 Power of Attorney.[97] Below I address in turn each alleged instance of Respondent's wrongful conduct.

---

[94] *Schock v. Nash*, 732 A.2d 217, 225 (Del. 1999) (citing *Stegemeier v. Magness*, 728 A.2d 557, 562-65 (Del. 1999)).

[95] *Sachs*, 2023 WL at *10 (citing *Stegmeier*, 728 A.2d at 564).

[96] *Coleman*, 948 A.2d at 429.

[97] Both parties spent significant time at trial engaging in lines of questioning toward witnesses addressing the events surrounding the execution of the 2018 Power of Attorney, only for Petitioner's counsel to inform the Court that they were not specifically asking the court to invalidate the 2018 Power of Attorney. Tr. 368:3-4 ("I'm not specifically asking the Court to invalidate and overturn the 2018 power of attorney"). Petitioner's counsel states that the petition did not contain a count requesting the Court's opinion to address the validity of the document and indicated their deferral to the Court on whether it was necessary to address the issue. Tr. 367: 15-22. As this is not in dispute between the parties, I decline to address issues related to the status of Respondent as Agent pursuant to the 2018 Power of Attorney.

### 1. Petitioner has failed to prove that Respondent breached his fiduciary duty by listing his name as the beneficiary designation of the Decedent's VCM Account.

The Petitioner has the burden to prove her claims by a preponderance of the evidence.[98] "Proof by a preponderance of the evidence means proof that something is more likely than not," and if the evidence presented at trial stands on equal ground the Court must find against the party carrying the burden of proof.[99] It follows that the Court is unable to find in favor of the party that bears the burden of proof when the evidence presented to the Court is inconclusive.

The Petitioner's allegation that the Respondent used his status as Agent to designate himself as beneficiary of the VCM Account on behalf of his father, if proven by the Petitioner by a preponderance of the evidence, would be considered a self-dealing transaction.[100] Respondent claims that the first time he logged onto the VCM website it prompted him to inform them who the primary beneficiary was, and he listed his own name to reflect his elevation from secondary beneficiary to primary

---

[98] *Sachs*, 2023 WL at *10 (citing *Heller v. Kiernan*, 2002 WL 385545, at *3 (Del. Ch. Feb. 27, 2002)).

[99] *JER Hudson GP XXI LLC v. DLE Investors*, LP, 275 A.3d 755, 782, (Del. Ch. May. 2, 2022) (citing *Martin v. Med-Dev Corp.*, 2015 WL 6472597, at *10 (Del. Ch. Oct. 27, 2015).

[100] *Sachs*, 2023 WL at *10 (citing *Stegmeier*, 728 A.2d at 564).

beneficiary after his mother passed.[101] At trial Petitioner presented evidence of the VCM website data showing the moment that Respondent's name was added as beneficiary on the VCM website.[102] Petitioner argues this action of listing his name as beneficiary on the VCM website alone is sufficient evidence to prove that Respondent engaged in a self-dealing transaction that constitutes a breach of his fiduciary duties owed as agent of the Decedent. I disagree. This issue hinges not on the Court's ability to say, with certainty, that the Respondent was or was not originally the named beneficiary of the Decedent's VCM Account but rather is decided on the Petitioner's ability to prove by a preponderance of the evidence that the Respondent's conduct when first logging onto the new servicer's website was a self-dealing transaction in which he unlawfully designated himself a beneficiary, and was not merely his informing the new servicer of his already established status as beneficiary when prompted.[103] A task the Court believes requires the Petitioner to put forth evidence to the beneficiary designations prior to the account's transfer from one servicer to the other.

---

[101] Tr. 138:3-14; Tr. 146:22-147:2; Tr. 190:4-11.

[102] JX E 30:1-15; Exhibit G at 2.

[103] *See Sachs*, 2023 WL at *10 ("The Plaintiff must prove [the breach of fiduciary duty elements] by a preponderance of the evidence"); *see, also In re Happy Child World, Inc.*, 2020 WL 5793156, at *10 (Del. Ch. Sept. 29, 2020) ("By implication, the preponderance of the evidence standard also means that if evidence is equipoise, the Plaintiff loses").

The Petitioner, as the bearer of the burden, is tasked with proving that Respondent was not named the secondary beneficiary on the VCM Account when it was under the control of USAA, not after it had been transferred to VCM. At trial, the only evidence provided in reference to the original beneficiary designations was the testimony of the Respondent stating that he was listed on the USAA website as the secondary beneficiary and then Ms. Corrado's testimony that her brother had informed them of his beneficiary status at a family meeting, stating also his intention at the time to distribute the funds equally among his siblings.[104] Arthur Wright, employee for VCM, provided deposition testimony that the account from USAA was linked to the account at VCM, but also revealed that he himself was not involved in the transfer of the data as the transfer occurred prior to his start of employment there.[105] The Court concedes that neither the Petitioner or the Respondent have been able to provide sufficient evidence that is conclusive as to the original beneficiary designations, but notes that both parties agree on the fact that USAA does not have the original account information.[106]  A lack of information available on the original beneficiary designations is insufficient to determine whether the Respondent was

---

[104] Tr. 166:7-22; Tr.186:7-187:3; Tr. 313:2-314:5.

[105] JX E 36:1-24; Tr. 37:15-22.

[106] Tr. 158:24-259:9.

listed as a secondary beneficiary already but is sufficient for the Court to find that the Petitioner has failed to meet her burden of proof.

I must find that the Respondent did not breach his fiduciary duty in relation to the beneficiary designation because the Petitioner has failed to meet her burden of proving that Respondent ever designated himself as the sole beneficiary of the Decedent's VCM Account. The Petitioner is therefore not entitled to requested relief of entering judgment in favor of the estate for the value of the VCM Account because the Court is unable to declare the Respondent's status as beneficiary to be invalid. The Respondent is also entitled as named beneficiary to the entirety of the funds in the Decedent's VCM Account.

> **2. The Respondent breached his fiduciary duties for transferring his father's license plate to himself on behalf of his father, and for using his father's assets for personal use.**

An Agent acting under a power of attorney on the principal's behalf, who transfers the principal's assets to himself, "has committed improper self-dealing, absent voluntary and knowing consent of the principal."[107] "A self-dealing transfer of the principal's property to the attorney-in fact is voidable in equity [,]"[108] and

---

[107] *Matter of Estate of DeGroat*, 2020 WL 2078992, at *17 (Del. Ch. Apr. 30, 2020) (quoting *Pennewell v. Harris*, 2011 WL 691618, at *3 (Del. Ch. Feb. 4, 2011)).

[108] *Coleman*, 948 A.2d at 429.

once the challenging party has proven a self-dealing transaction has taken place the burden shifts onto "the agent to prove that a self-interested transaction involving the principal is valid."[109] The agent can fulfill their burden of establishing the fairness of the transaction through a showing that they entered the transaction with the voluntary and knowing consent of the principal after full disclosure.[110]

The Respondent, while acting on the Decedent's behalf under the 2018 Power of Attorney used the Decedent's funds to buy groceries, alcohol, and gas for his own personal benefit.[111] The Respondent used his father's vehicles and allowed for his son to use his father's vehicles for matter's unrelated to benefiting the Decedent and without the Decedent's consent.[112] The Respondent, acting in his role as Agent, transferred the Decedent's low digit Delaware license plate to himself for no consideration.[113] All of these instances constitute self-dealing transactions that the Respondent provides no proof were approved by his father after full disclosure. I must therefore find that the Respondent breached his fiduciary duty when he used

---

[109] *DeGroat*, 2020 WL at *17 (citing *Pennewell v. Harris*, 2011 WL 691618, at *3 (Del. Ch. Feb. 4, 2011)).

[110] *Pennewell*, 2011 WL at *3; *Coleman*, 948 A.2d at 429.

[111] Tr. 77:2-20; Tr. 116:13-24.

[112] Tr. 116:13-24; Tr. 117:7-118:9.

[113] Tr. 119:15-120:24.

his status as Agent to transfer his father's license plate to himself without consideration and for using his father's assets for personal use.

### 3. The Respondent breached his fiduciary duties owed as agent for failing to provide regular accountings to the Petitioner as prescribed in the terms of the 2018 Power of Attorney.

"[A]n agent that has accepted appointment pursuant to a personal power of attorney shall, in connection with exercising the authority granted to such agent therein[,] [a]ct in accordance with the principal's reasonable expectations to the extent actually known by the agent and, otherwise, in the principal's best interest."[114] Under Title 12 of the Delaware Code, Section 49A-114(g) "upon the death of the principal" a "personal representative or successor in interest of the principal's estate" may request an accounting, and "[i]f so requested the agent shall comply with the request within a reasonable period of time." Failure to disclose the relevant financial documents relevant to the Agent's conduct as power of attorney upon the request of "a successor in interest of the principal's estate" constitutes a breach of an agent's duties imposed under Title 12 of the Delaware Code, Section 49A-114(g).[115] "The Court has not permitted fiduciaries to excuse themselves of this obligation with

---

[114] 12 Del. C. § 49A-114(a)(1).

[115] *Sachs*, 2023 WL at *13 (finding that an Agent's duties were breached "when she failed to disclose receipts, disbursements, or transactions" upon request of a beneficiary of the estate after the death of the principal).

informal or incomplete accountings: '[a fiduciary] cannot excuse her own failure to maintain records in a safe place, nor can she rely on a narrative and answers to deposition questions as a substitute for a formal accounting.'"[116]

The 2018 Power of Attorney provides in its terms that the Respondent is to "prepare written, semi-annual reports regarding [the Decedent's] finances, including income received and expenses incurred by my agent for me during the previous six-month period. These reports shall be mailed within 30 days of the end of each six-month period to [the Petitioner]."[117] The Respondent implies through his testimony that he has fulfilled all accounting obligations by virtue of being available to answer questions from the beneficiaries of the Decedent's estate regarding his actions taken as Agent and due to the Respondent having access to all the relevant account information that would be used to compile the formal accounting that she requests.[118] The Respondent admits to not providing a formal accounting upon formal request of the Respondent.[119] The Respondent, both under the 2018 Power of attorney and as a

---

[116] *Matter of Estate of DeGroat*, 2020 WL 2078992, at *23 (Del. Ch. April 30, 2020) (quoting *In Matter of Estate of Dougherty*, 2016 WL 4130812, at *12 (Del. Ch. Jul. 22, 2016)).

[117] JX K at 3.

[118] Tr. 171:2-172:7.

[119] Tr. 58:1-21.

beneficiary of the Decedent's estate has standing to request a formal accounting of all of Decedent's assets within the Respondent's control as Agent of the Decedent.[120] The Respondent's limited and vague answers to the Petitioner's request for financial information regarding their father's assets and the fact that the Petitioner had the online account log in information of most of the relevant accounts being managed by the Respondent in his role as agent does not relieve him of his obligations under the 2018 Power of Attorney and under Title 12 of the Delaware Code, Section 49A-114(g) to provide the Petitioner with a formal accounting of all of the assets within his control pursuant to the 2018 Power of Attorney.[121] I find that the Respondent breached his fiduciary duties by not providing a regular formal accounting to the Petitioner in compliance with the terms of the 2018 Power of Attorney and for then failing to provide an accounting upon the Petitioner's request when she was within her rights to do so as a successor in interest and co-executor of the Decedent's estate.

---

[120] JX K at 3; 12 Del. C. §49A-114(g)

[121] JX P; Tr. 347:6-17; *DeGroat*, 2020 WL at *23 (Del. Ch. April 30, 2020) (quoting *In Matter of Estate of Dougherty*, 2016 WL 4130812, at *12 (Del. Ch. Jul. 22, 2016)).

### B. Petitioner, in part, has successfully met her burden of proof that Respondent was unjustly enriched through actions taken as Agent of his father.

"Unjust enrichment is the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience. The elements of unjust enrichment are: (1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law."[122] Unjust enrichment claims are duplicative of fiduciary claims, however "Delaware law does not bar both claims from proceeding."[123] When an unjust enrichment claim relies on a breach of fiduciary duty in the same self-interested transaction, Delaware Courts will "consider… both the breach of fiduciary duty and unjust enrichment claims, even though Plaintiffs are entitled to only one recovery."[124]

Petitioner brought claims for unjust enrichment against Respondent for misuse of his father's assets for personal use and through the alleged designation of himself as beneficiary of his father's VCM Account. For the same reason explained

---

[122] *Nemec v. Shrader*, 991 A.2d 1120,1130 (Del. 2010).

[123] *DeGroat*, 2020 WL at *21.

[124] *Id.* (citing *MCG Capital Corp. v. Maginn*, 2010 WL 1782271, at *25 n147; *Dubroff v. Wren Holdings*, LLC, 2011 WL 5137175, at *11 (Del. Ch. Oct. 28, 2011)).

previously on this matter, I find that the Petitioner has failed to provide sufficient evidence to make a showing by a preponderance of the evidence that the Respondent was not the original secondary beneficiary on the VCM Account when it was created, and I therefore am also unable to find that the Petitioner has met their burden of proof on their claim for unjust enrichment relevant to Respondent's beneficiary status on the Decedent's VCM Account.

As for the unjust enrichment claims related to the Respondent using the Decedent's funds to buy groceries, gas for personal use, use of the Decedent's vehicles by him and his son for personal use, and the transfer of the low number license plate to himself, Petitioner has successfully proven the Respondent has been unjustly enriched. The Respondent was unjustly enriched when he engaged in the self-interested transactions of transferring the Decedent's license plate to himself, using Decedent's funds for personal use, and using the Decedent's vehicles for personal use.

Because claims of unjust enrichment are duplicative of claims for breach of fiduciary duty, I find the Decedent's estate is only able to recover once for the Respondent's conduct in relation to using his father's assets for personal use and for engaging in the self-dealing transfer of the license plate. The transactions are to be

found void, and the Respondent is liable to the Estate in the amount in which he was enriched by his conduct in relation to his breach of fiduciary duty.

### C. The Respondent must provide an accounting to the Decedent's beneficiaries/to the Petitioner.

A finding of a party's breach of fiduciary duty or unjust enrichment can give rise to a remedy of an accounting as a matter of law.[125] An accounting may be ordered as "an equitable remedy that consists of the adjustment of accounts between parties and a rendering of a judgment for the ascertained to be due to either as a result."[126]

I find it appropriate to order the Respondent to provide a formal accounting of all of Decedent's assets within his control during the time he was acting as Power of Attorney and enter judgment in favor of the Decedent's estate for all unaccounted-for assets and any damages suffered because of the Respondent's breaches of fiduciary duty.

---

[125] *Matter of Estate of DeGroat*, 2020 WL 2078992, at *23 (Del. Ch. Apr. 30, 2020*); In Matter of Estate of Dougherty*, 2016 WL 4130812, at *12; *Matter of Lomax*, 2019 WL 4955315, at *5 (Del. Ch. Oct. 9, 2019).

[126] *Albert v. Alex Brown Mgmt. Servs., Inc.*, 2005 WL 2130607, at *11 (Del. Ch. Aug. 26, 2005).

### D.  I do not find it necessary to impose a constructive trust.

"A constructive trust is an equitable remedy of great flexibility and generality. The principle is that where a person holds property in circumstances in which, in equity and good conscience, it should be held or enjoyed by another, he will be compelled to hold the property in trust for that other."[127] This remedy may be imposed by a Court in instances where they have found the defendant to have engaged in fraudulent, unfair, or unconscionable conduct that they have then been unjustly enriched by at the expense of someone he owed a duty to.[128] "A constructive trust is one imposed by a court of equity as a remedy to correct the unlawful vesting, or assertion of, legal title."[129]

"[A] constructive trust avoids a continuing relationship with the beneficiary by requiring transfer of the property to the [party] who has established an equitable entitlement."[130] This remedy may be imposed as it "relates to specific property or

---

[127] *Cannon v. Sineros*, 1987 WL 16286, at *2 (Del. Ch. Aug. 31, 1987) (internal citations omitted).

[128] *Adams v. Jankowskis*, 452 A.2d 148, 152 (Del. 1982).

[129] *E. Lake Methodist Episcopal Church, Inc. v. Trs. Of Peninsula Del. Ann. Conf. of United Methodist Church, Inc.*, 731 A.2d 798, 809 n.4 (Del. 1999) (citing *Hogg v. Walker*, 622 A.2d 648, 651-52 (Del. 1993)).

[130] *Hogg*, 622 A.2d at 652.

identifiable proceeds of specific property[,]"[131] and "has been applied to the recovery of money, based on tracing an identifiable fund to which plaintiff claims equitable ownership."[132] "A constructive trust cannot be imposed upon the proceeds… [which] do not remain in an identifiable account."[133]

Petitioner requested in their complaint for a constructive trust to be imposed on the assets improperly obtained by the Respondent that were either assets that were meant to pass through the Decedent's Estate or assets that were intended to pass directly to other beneficiaries including, but not limited to, proceeds from the Decedent's VCM and Prudential accounts.[134] No constructive trust is necessary for the funds relating to the VCM account as I have found that the Petitioner has not met her burden of proof relating to her claim of unjust enrichment and breach of fiduciary duty in relation to the Respondent's beneficiary status on that account.

As for the Decedent's Prudential Account, given that the proceeds from that account have already been distributed among the four siblings, I find any

---

[131] *Id.* (citing *McMahon v. New Castle Associates*, 532 A.2d 601, 608 (Del. 1987)).

[132] *Id.* (citing *Adams v. Jankouskas*, 452 A.2d 148 (Del. 1998)).

[133] *Nash v. Schock*, 1997 WL 770706, at *6 (Del. Ch. Dec. 3. 1997); *see, also Sachs v. Sachs*, 2023 WL 2379389, at *13 (Del. Ch. Mar. 7, 2023) (finding a constructive trust to be an inapt remedy to address liquidations when they did not remain in an identifiable account.).

[134] D.I. 1 at ¶58-60.

discrepancies that may arise are best handled through an order of an accounting and the award of a remedy in the amount of any unaccounted-for assets, and not through an award of a constructive trust because the proceeds therefrom do not exist in an identifiable account. The same is true for the low digit license plates, both the one the Respondent transferred to himself and the one he transferred to his brother, and although these are specific assets for which the Decedent's Estate can claim equitable ownership over after they were transferred unlawfully, I do not find a constructive trust to be necessary. The transfers of the license plates are deemed invalid and to the extent the brothers are interested in retaining them, they should be reflected as a deduction in the amount of the value of the license plates from the two brother's final distributions from the Decedent's estate.

### E.     Attorneys' fees and costs

In Delaware, the Courts typically follow the general American rule that holds litigants responsible for their own fees and an exception to this general rule exists in instances where the Court finds that the losing party acted in bad faith.[135] "[T]he bad faith exception is applied in extraordinary circumstances primarily to deter abusive litigation and protect the integrity of the judicial process."[136]

---

[135] *Marra v. Brandywine Sch. Dist.*, 2012 WL 4847083, at *4 (Del. Ch. Sept. 28, 2012).

[136] *Nichols v. Chrysler Gp.*, LLC, 2010 WL 5549048, at *3 (Del. Ch. Dec. 29, 2010).

I do not find that the Respondent acted in bad faith such that the Petitioner should not have to bear her own fees in pursuing this litigation. Petitioner, as the prevailing party, is entitled to costs associated with filing this lawsuit under Court of Chancery Rule 54(d) which states, "costs shall be allowed as of course to the prevailing party unless the Court otherwise directs."

## III.   CONCLUSION

For the reasons explained herein, I find that the Respondent must provide to the estate a full accounting of all assets under his control during his time as Agent under the 2018 Power of Attorney and enter judgment in favor of the estate for all unaccounted for assets. I also find that the Respondent is liable to the estate for all expenses related to conduct in which he was found to be both unjustly enriched and in breach of his fiduciary duties as Agent.

Barring the filing of exceptions, Petitioner shall file an affidavit under Court of Chancery Rule 88 within 30 days of the date of this report, to which the Respondent may reply within 10 days of filing.

This is my final report, and exceptions may be filed under Court of Chancery

Rule 144.

Respectfully submitted,

*/s/ Loren Mitchell*

Magistrate in Chancery